767 So.2d 6 (2000)
STATE of Louisiana
v.
Donald TILLEY.
No. 99-KA-0569.
Supreme Court of Louisiana.
July 6, 2000.
Rehearing Denied August 31, 2000.
*10 Anthony James Hebert, Baton Rouge, Robert L. McGlasson, Clive Adrian Stafford Smith, New Orleans, Peggy S. Trammell-Goods, Baton Rouge, Counsel for Applicant.
Dale R. Lee, Creighton Brooks Abadie, Baton Rouge, Antonio Marcell Clayton, Port Allen, Richard P. Ieyoub, Attorney General, John A. Cannon, Kenner, Stephen Nichols Pugh, Monisa L. Thompson, Douglas P. Moreau, Baton Rouge, Counsel for Respondent.
VICTORY, J.[*]
On March 27, 1996, after ten days of voir dire, and a five-day trial, an East Baton Rouge Parish jury found defendant, Donald Tilley, guilty of the first degree murder of Roscoe Brister. One day later, after the penalty phase hearing, the jury sentenced defendant to death after finding the three aggravating circumstances urged by the state: 1) the offender was engaged in the perpetration or attempted perpetration of Armed Robbery, First-Degree Robbery, or Simple Robbery; 2) the victim was 65 years of age or older; and 3) the offense was committed in an especially heinous, atrocious, or cruel manner. La. C.Cr.P. art. 905.4. On direct appeal to this Court under La. Const. Art. 5, Sec. 5(D), defendant appeals his conviction and sentence, raising 17 assignments of error. None of the errors are meritorious.[1] Therefore, we affirm defendant's conviction and sentence.

FACTS
On March 14, 1996, the victim, 68-year-old Roscoe Brister and his fiancé, Vallie Miles, drove to a Burger King in East Baton Rouge Parish. Ms. Miles handed the victim $10.00 to get their food, and he stepped out of the car to enter the restaurant. Before he could reach the restaurant, defendant approached him and asked him for his money. Ms. Miles heard the victim claim he did not have any money and then saw defendant grab the ten dollar bill from his hand. Defendant then began stabbing Mr. Brister, who suffered a total of five stab wounds. Burger King employees witnessed the offense and ran to the victim's aide. Mr. Brister told them not to let defendant get away and several of the employees gave chase. Defendant threw his knife down under the interstate *11 and was soon caught by his pursuers, who sat on him until police arrived.

ERRORS ALLEGED AT THE PRETRIAL STAGE

Failure to suppress defendant's custodial statements
In his fourteenth assignment of error, defendant argues that the trial court erred by refusing to suppress his custodial statements. Specifically, defendant argues that while being interrogated he indicated that he wished to cease the interrogation and speak with an attorney. According to appellate counsel, rather than providing him with an attorney, police continued to go "on with the booking process," and, as a result, defendant was given the message that he would not receive a lawyer until the police "felt good and ready to allow it."
Once an individual in custody expresses a desire to deal with police only through counsel, all questioning must cease immediately and he is not subject to further interrogation until an attorney is present, unless the suspect initiates further communication, exchanges, or conversation with the police and validly waives his earlier request for counsel. State v. Koon, 96-1208, pp. 6-9 (La.5/20/97), 704 So.2d 756, 762-763, cert. denied, Koon v. Louisiana, 522 U.S. 1001, 118 S.Ct. 570, 139 L.Ed.2d 410 (1997) (citing Edwards v. Arizona, 451 U.S. 477, 484-485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981); Miranda v. Arizona, 384 U.S. 436, 440-445, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966); State v. Abadie, 612 So.2d 1, 4-5 (La.1993), cert. denied, Louisiana v. Abadie, 510 U.S. 816, 114 S.Ct. 66, 126 L.Ed.2d 35 (1993); State v. Lee, 524 So.2d 1176, 1183 (La. 1987)). When a defendant exercises his privilege against self-incrimination, the validity of any subsequent waiver depends upon whether the police have "scrupulously honored" his right to cut off questioning. State v. Koon, supra (citing Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975)). However, police are not obliged to ignore spontaneous and unsolicited statements by someone in custody, as long as those statements do not result from police-initiated custodial interrogation or questioning "reasonably likely to elicit an incriminating response." Id. (Citing State v. Ross, 95-1798 (La.3/8/96), 669 So.2d 384, 386 (per curiam)). Nor does a previous assertion of the right to counsel bar admission of such statements. Id. When an accused invokes his Miranda right to counsel, the admissibility of a subsequent confession is determined by a two-step inquiry: (1) did the accused initiate further conversation or communication; and (2) was the purported waiver of counsel knowing and intelligent under the totality of the circumstances. Id.; State v. Abadie, supra at pp. 5-6.
At the hearing on the motion to suppress, Detective Brinkhaus testified that he was present when two audio taped statements were made voluntarily by defendant. The detective testified that when he first contacted defendant, he was in the booking area of the parish prison. At that time, he advised him of his rights and the defendant indicated that he wished to speak with an attorney. The detective immediately ceased speaking with him and finished the booking process. Then, while fingerprinting the defendant, defendant told the detective that he had changed his mind and was willing to give a statement without an attorney present. The detective testified that the defendant initiated the conversation and that he went over all of the defendant's rights pursuant to Miranda before commencing any interview. In addition, the state admitted into evidence a waiver of rights form signed by defendant which indicates that he agreed to give the detective a statement and that he had two years of college education. Moreover, Detective Wolfanger testified that he and Detective-Sergeant Brinkhaus were both present when defendant gave his video-taped statement and that neither of them made any promises or inducements, nor did they threaten or coerce defendant in order to get the statement. The officer also testified that not only did *12 he inform defendant of his Miranda rights, but so did the arresting officers. Furthermore, Detective Bates testified that he witnessed defendant give the video-taped statement and that the officers involved did not coerce defendant in any manner. The defense presented no evidence to contradict this testimony.
Accordingly, all the evidence presented at the motion to suppress indicated that defendant reinitiated contact with police after his invocation of his right to counsel expressing that he would give a statement without an attorney present, and that this waiver was knowing and intelligent. Consequently, the trial court did not err in denying defendant's motion to suppress, and this assignment of error is without merit.

ERRORS ALLEGED DURING VOIR DIRE

Batson Violations
In his first assignment of error, defendant argues that the prosecution exercised peremptory challenges in a racially discriminatory manner in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Defendant insists that the state struck African-American jurors peremptorily for reasons that do not appear race-neutral. Specifically, defendant contends that: 1) the prosecutor expressly interjected race as a relevant factor in the Batson inquiry by justifying his jury selection strategy in part upon his own race, suggesting that because he is African-American he is not capable of racial discrimination; 2) the trial court erroneously denied defendant's Batson challenge while simultaneously finding the prosecutor's purported race-neutral explanations were "disingenuous"; 3) the prosecutor acknowledged consciousness of a Batson violation by offering to withdraw the most offending of his peremptory challenges against an African-American juror after the trial court had denied the defense's Batson motion.
Under Batson, a defendant must first establish a prima facie case of discrimination by showing facts and relevant circumstances which raise an inference that the prosecutor used his peremptory challenges to exclude potential jurors on account of their race. State v. Hobley, 98-2460 (La.12/15/99), 752 So.2d 771, 782. The burden of production then shifts to the state to come forward with a race-neutral explanation, and if the race-neutral explanation is tendered, the trial court then must decide, in step three, whether the defendant has proven purposeful racial discrimination. Id.; Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)(per curiam) (citations omitted); State v. Collier, 553 So.2d 815, 818 (La. 1989). Although the state's explanation must be based on more than an assumption or a hunch, State v. Collier, supra, to be facially valid, it need not be persuasive, or even plausible; thus unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral. State v. Hobley, supra; Purkett, 514 U.S. at 767, 115 S.Ct. at 1771.
Faced with a race-neutral explanation, the defendant then must prove to the trial court purposeful discrimination. Id. (Citing Batson, supra; Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)). The proper inquiry in the final stage of the Batson analysis is whether the defendant's proof, when weighed against the prosecutor's proffered race-neutral reasons, is sufficient to persuade the trial court that such discriminatory intent is present. Id. (Citing State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272, 290). Thus, the focus of the Batson inquiry is upon the intent of the prosecutor at the time he exercised his peremptory strikes. Id. The trial court should examine all of the available evidence in an effort to discern patterns of strikes and other statements or actions by the prosecutor during voir dire that support or reject a finding of discriminatory *13 intent. Id.; State v. Tyler, 97-0338 (La.9/9/98), 723 So.2d 939, 942-43, cert. denied, Tyler v. Louisiana, 526 U.S. 1073, 119 S.Ct. 1472, 143 L.Ed.2d 556 (1999). Because the factual determination pertaining to intentional discrimination rests largely on credibility evaluations, the trial court's findings are entitled to great deference by the reviewing court. Id.; State v. Snyder, 98-1078 (La.4/14/99), 750 So.2d 832.
The instant case is not one in which the Court must ascertain whether a prima facie showing of purposeful discrimination was made. Here, after each Batson challenge, the trial court required that the prosecutor provide race-neutral reasons for the peremptory challenges. See State v. Green, (applying Hernandez v. New York, supra, and concluding that once the trial judge has demanded race-neutral reasons for his peremptory strikes from the prosecutor, the issue of a prima facie case of discrimination becomes moot). Thus, we must determine whether or not the state offered race-neutral explanations for its peremptory strikes and, if so, whether the trial court erred in finding that the defendant's proof, when weighed against the prosecutor's proffered race-neutral reasons, was insufficient to persuade it that such discriminatory intent was present.
In the first motion, defense counsel noted that the prosecution had used the first six of seven peremptory strikes against African-Americans in the venire[2]. At the time the second challenge was made, the prosecutor had exercised eight of eleven strikes against African-Americans[3]. The resulting jury consisted of only one African-American. During the first of defense's Batson challenges, the state claimed that it excused African-American jurors for a number of reasons. First, the state maintained that it exercised a peremptory challenge on India Spears because she stated on her questionnaire that she favored the death penalty only when there "is no other alternative." The state also noted that she responded that she would "feel pressured" to make a decision. Next, the state justified its excusal of Henry Cage by pointing to his response that he would seriously consider a life sentence and that he would consider whether the defendant appeared remorseful in deciding the penalty. As to Willie Ennis, the state argued that he was ambivalent in all his answers and that the prosecutor could not "get a read on him." As to Carol Simon, the prosecutor noted that two of her sons had been successfully prosecuted for felonies. With Sherlyn Taylor, the prosecutor argued that he excused her because she knew one of the defense attorneys. Finally, the state claimed it excluded Ronald Perkins because he did not know where his children worked and because he stated that he would lean heavily toward a life sentence. After hearing argument from both the state and the defense, the trial court ruled that,
... While they are all black jurors with the exception of one, Ms. Nolan, the state has tendered reasons why it felt that that person was more inclined to either favor a life sentence or be less inclined to favor the death penalty. And because the juror's attitude on penalty are relevant in a first-degree murder case when they are not relevant in any other kind of case, certainly both sides will attempt to seat those jurors who are most likely, in their estimation, to view their fact favorably. And while it may appear on the surface that the state had exercised its challenges in a racially motivated *14 factor, in giving its explanation, the state has satisfied the court that the use of peremptory challenges was more based on the person's perceived inclination to favor a life sentence as opposed to the death penalty. And for those reasons, I will note your Batson objection but, nevertheless, deny it.
This ruling is correct. The state's proffered reasons were plausible, supported by the record, and race-neutral.[4]Hernandez, 500 U.S. at 357, 111 S.Ct. at 1868-69 (state response will qualify as race-neutral "unless a discriminatory intent is inherent in the prosecutor's explanation."). Defendant, the opponent of the strike, offered no facts or circumstances supporting an inference that the state exercised these particular strikes in a racially discriminatory manner. State v. Green, supra at 288.
The majority of defendant's argument focuses on the defense's second Batson motion which occurred when the state attempted to back-strike another African-American, Eddie August, and utilized one of its last peremptory challenges on another African-American, Samuel London.
With respect to Mr. London, the state justified its reasons for back-striking Mr. London as follows:
STATE: As it relates to Mr. London, I'll have to go back into whatever day it was we had Mr. London, but if I remember, Mr. London had a bad knee. And the same thing basically with him. I've got his questionnaire here. One of his questions, and I wrote down from yesterday, he stated, "I don't want to judge anyone. I try to stay out of it. I try to stay out to make that decision." This is what he had written under number 91 for Samuel London. And if you look at his response to it depends on the crime and what happens leading up to the crime. Well, I don't want to give out all of my strategy, but I can look at number 41 and 42 and when looking at it here, comparing the two, it appears to me that his decision made him feel that it's serious, and the way that he wrote his answer here, coupled with what colloquy that we had here, they put on some 30 or 40 minutes, and I felt so myself, that he wouldn't come back with a death penalty. And judge, that's what I'm basing my reason for bumping him, not because of their race.
The state's tendered reasons are facially race-neutral. "They contain none of the cultural, geographic, or linguistic classifications that, because of the ease with which such classifications may serve as a proxy for an impermissible classification, necessitate careful scrutiny." State v. Hobley, supra at 783. Mr. London did say that he had knee surgery on September 23, 1995, and that it would be difficult for him to sit for any lengthy period of time unless he could sit on the end. In addition, while he did state that "I could do it, because this is a law of the land, or whatever, and I know I'm not God. But if that's the law of the land and the evidence says that, or whatever, can I do it, I believe I can," he also responded to the court's inquiry as to whether he had heard of a case that he thought was appropriate for the death penalty that "I don't want to judge anyone. I try to stay out of it. I try to stay out to make that decision," which is what the prosecutor recalled. Finally, we have carefully reviewed the transcript of voir dire and can find no questions or statements by the prosecutors in exercising their challenges that support an inference of purposeful discrimination. Accordingly, the trial court was correct in denying defendant's Batson motion as to Mr. London.
*15 When the trial court asked the prosecutor to explain his basis for challenging Mr. August, the state initially responded:
STATE: ... first of all I would like the record to reflect again, as I stated in the last one, that I happen to be a black prosecutor and this happens to a black on black crime, and it happens to be a crime of such a nature we're not, I'm not, the state is not bumping anybody just because of the color of their skin. We're bumping jurors who we don't believe would be able to come back here and fairly consider a death penalty. And we're taking into consideration their response to our question. And not only the way they've answered the questions. And I think the court told Mr. Hebert, and I thought you put it quite succinctly the other day in that in the death penalty case, there's a whole line of cases that say that, that you do it in such a nature where it is racially neutral. But when we bring in a death penalty case, you've got a different perspective. It's unlike any other cases, and that is the perception from the prosecutors. We, I think, have the right to pick what type of juror that we want on this particular case. Just to say we're bumping a person because of his race, that's unfounded. He bumped a couple of blacks himself and moved for a whole bunch of causes on black jurors themselves. So am I to say that he's excluding blacks on the jury? He's bumped Mr. Dunn for cause, he bumped Mr. Young for cause, and he's bumped Ms. McClean with peremptory challenges.
COURT: Well, Batson has to do with peremptory challenges, not challenges for cause, Mr. Clayton.
STATE: Well, he bumped Ms. McClean for peremptory challenges, and, I mean, just to go back and think about race, that's not the issue here. I mean, I have
Perhaps recognizing that the prosecutor's race should have no bearing on a Batson analysis, the trial court then asked for a more direct response:
COURT: May I ask you question? [sic]
STATE: Yes, ma'am.
COURT: May I ask you a question? Between Mr. August and Mr. Fountain, who was in fact selected and was excused by the state, can you tell me why a prosecutor would feel more comfortable with a juror that says, "I feel indifferent about the death penalty," as opposed to someone who says, "I don't enjoy the thought of it, but if the crime requires the death penalty, then I can do it?" Can you explain to me why the state would be more comfortable with a juror who has had a friend murdered in the Calendars Restaurant murder who nevertheless feels indifferent towards the death penalty, why you feel more comfortable about having that particular person on the jury than you would an African-American juror who said that they couldthey are not indifferent, they believe in it, they can personally vote for it, and if the circumstances warrant it, will vote for it?
STATE: And judge, my picking whether or not a person serves on the jury is not based upon just that one question. It's based on the total, all questions
COURT: Well, like your explanation as to Mr. August and contrast that with Mr. Fountain, since these two individuals in the same group of jurors were just questioned, those two individuals, and
STATE: Why, I can'tbut, I mean, I think it's somewhat unfair to me to come in and just give me two seconds and, "well, compare that, Mr. Clayton, and tell me"
COURT: Would you like a recess?
STATE: No, I don't think I need a recess necessarily. I mean, the point *16 is what we're looking for in a particular juror, when I talk to them, I asked him, I said
COURT: Again, Mr. Clayton, may I interrupt? The objection is that your use of a peremptory challenge against Mr. August was racially motivated in that the state is seeking to seat a jury that has as few a number of African-Americans as it can seat. You have indicated that, in making you decision who to bump and who not to bump, you look at their views on the death penalty, the strength of those views on the death penalty and not on the race of the individual.
STATE: Right.
COURT: So I am simply asking: Given that as your standard, can you explain to the court why you accept a white juror who says, "I feel indifferent about the death penalty. If the crime is severe enough, the punishment should fit," can you tell mecan you distinguish between those two jurors, giving me a racially neutral explanation for why you would feel more comfortable with a juror who is indifferent towards the death penalty than someone who said that they could vote to put someone to death.
After this pointed question by the trial court, the state responded:
STATE: Quite frankly, judgeand this is only part of the whole decision I make. When I asked Mr. August about his penalty, whether or not he can, before the death penalty is given, he reared back in his chair, and I told him, I said people who tend to draw back from you tend to be reluctant to find it, and things of that nature. When I asked Mr. Fountain about it, the first thing he did was, "I'm indifferent about it, but I can impose it." I think I went through and extended conversation with him about intoxication, mitigation, all the mitigating evidence that I thought would probably hurt the state and asked him what's his opinion on it, and, from my perspective, each one of them was in like with what I was looking for in a particular juror. He responded the way that I thought he would come back that a person who would be open to persuasion in terms of delivering a death penalty. Now, compare that back to Mr. August, when I asked him that first question, "tell me your opinion about the death penalty" when he crawls back into his pit
COURT: Well, actually, he leaned back and talked the way that Mr. Dunn also did.
STATE: But, your honor, this is me perceiving a juror that I would want to pick in the jury as a prosecutor. Nobody[5]
COURT: Go ahead.
STATE: In this courtroom
COURT: Go ahead.
STATE: is the prosecutor other than Mr. Pugh
COURT: Go ahead.
STATE: to understand what type of juror they could make for them.
COURT: Go ahead.
STATE: In myand the whole problem is race was not factored in at all with me and this particular thing. And to continue my argument, I have a bunch of victims that I have to answer to. And if Mr. August is forced on this jury and then he holds it up because I'm having the impression that he may be the one to vote not guilty, then
COURT: Okay. Can you tell me what you base that perception on?
STATE: I just don't believe that he would come back with the death penalty. I feel he would come back with life.
COURT: Based on what?

*17 STATE: Based on all the questions that I asked him, you honor.
COURT: Give me a specific instance.
STATE: First of all, "how do you feel about the death penalty," and he'd rare back. Second of all, when I asked him about mental defect and mental disease, whether or not we put forth that plea. Third of all
COURT: What was his response to that, Mr. Clayton?
STATE: Your honor, I mean exactly verbatim, I'll have to play the tape back. His response was, on one of them, that, "I'll have to give some serious weight to that." "What do you mean about that?" As opposed to the other guy, Mr. Fountain, when I asked him the question about that, he was like, "huh," as I believed that. That's right. When I asked him about it, it was as if he didn't believe it. Then, another point that you brought to mind, is that he shrugged his shoulders a lot, and I brought that out on record. I said, "why did you even the questions to you, what's that about?" [sic] Indecisive? I mean, If factored in all that. And, nonetheless, we purposely held him and stored him to see if we could find a better juror who would be somewhat better. Would I have not liked to have had Mr. Dunn on the jury? Yes. And I stored him in hopes that I could get him to bump one back and replace him with Mr. Dunn? Absolutely. Would I not have wanted Mr. Young? Absolutely. If I held him back to get them, yeah. A lot of times that's part of our strategy, the holding back, let's see if we can to one of these other jurors, and that is exactly our strategy here.
And in winding down, your honor, we honestly believe, and this is our contention, that the fact that you have this type of case here, it's not bumping anybody because there's black on black. I think blacks would probably be more disposed to come back here and pop him the death penalty than whites. But when I'm sitting on here, they've got a serious reservation about it, your honor, then, from my perspective, and I don't want them to serve on a jury particularly if I don't think that I could persuade them. I don't care what color they are. I bump whites. I don't think that we canif we've got one challenge left, who that goes to, I don't know. But the bottom line, Mr. Pugh and I will look back at our forms and we'll strategize as to who should be bumped and as I was stating, you honor, that we ought not to be forced because of the fact that theirs are going to be awarded Batson, forced to put someone on the jury that we don't believe will come back with the death penalty. And if you've got 11 of them and he's the only one over thereand I tell my clients, "you know, we had a funny feeling about him," it's like constitutional rights, just like they have a constitutional right to tell the people race has nothing to do with it.
I've got Mr. Stumps on there. He's black. He answered the questions directly as the way they should be. I do not intend to back-strike him or bump him or anything like that. He's good. Everybody that has been bumped by the state, the only reason why they were bumped is because of the fact that we felt that we had reservations on. I have some other jurors, we've got one other thing, we're going to wait on. And as we progress down here, we feel there's one that we should bump and replace another one with better than that one, then we bump him and replace him back in the pool. That's part of our strategy. It has nothing to do with race.
The court then denied the defense's Batson challenge[6].

*18 COURT: I think the state is somewhat disingenuous when stating that they would prefer to have someone who was indifferent for the death penalty than someone who specifically stated that, yes, they believe in the death penalty and could personally return the death penalty; however, I am going to deny the Batson challenge. The record will reflect what the jury's responses were to the questions and on review, you live and die by that decision.[7]
Defendant argues that based on this statement, the trial court made a finding that the state had not offered race-neutral reasons for excluding Mr. August and thus, it erred in denying defendant's Batson motion. However, the statement by the trial court shows only that she thought one statement by the state, that they would prefer a juror who was indifferent to the death penalty over one who could vote for the death penalty, was "somewhat disingenuous."[8] She made no such findings as to the state's asserted belief that Mr. August would not vote for the death penalty based on (1) the fact that he leaned back in his chair when responding to questions about whether he could vote for the death penalty; (2) the fact that he shrugged his shoulders a lot; and (3) the prosecutor's recollection that Mr. August responded that he would give serious weight to evidence of mental defect. Like the reasons tendered for Mr. London, these reasons are facially race-neutral. Although the trial court thought that a portion of the state's explanation was "somewhat disingenuous," that does not affect the legitimacy or validity of the state's other reasons. See State v. Green, supra at 291-92 (where this Court held that although any of the reasons offered by the state in isolation would have been insufficient to warrant the exercise of a peremptory challenge, together they supported the trial court's determination that the state was not acting out of discriminatory motive).
This Court has held that "a peremptory challenge based on the body language of a prospective juror does not violate Batson when accepted by the trial judge, who possesses broad discretion in making the ultimate factual determination regarding purposeful discrimination." State v. Hoffman, 98-3118, p. 15 (La.4/11/00), 768 So.2d 542; State v. Hobley, supra at 783-84. The record reflects that the prosecutor actually commented during voir dire of Mr. August that he leaned back in his chair and shrugged his shoulders when questioned about the death penalty. Moreover, as in this case, a challenge based on body language is "stronger if an attorney is able to articulate an objective fact, such as that the juror was slow in answering questions or had to have questions repeated ..." Id. (Citing United States v. Bentley-Smith, 2 F.3d 1368, 1375 (5th Cir.1993)). Further, when questioned by the defense about whether he would consider certain mitigating circumstances, he stated "I think it should be something you should look at," rather than, as claimed by the state "I'll have to give some serious weight to that" and "What do you mean about that?" This minor discrepancy, when considered in light of the state's feelings about Mr. August's body language, is not enough to merit a finding that the state was acting with discriminatory intent in exercising a peremptory challenge against Mr. August. Thus, based on the entire voir dire, we find that the trial court did not err in denying defendant's Batson challenge as to Mr. August.

*19 Commitments from Jurors based on the facts of the case

In his fifth assignment of error, defendant argues that the trial court committed numerous errors during voir dire which ultimately deprived him of a fair trial. Specifically, defendant contends that the prosecutor was allowed to question prospective jurors, over his objection, on the facts of the case as he believed them to be, and to question them as to what their verdict would be in a certain factual situation.
First, defendant refers to the state's voir dire of prospective jurors Stumps, Simon[9], Putman, and Angelle. The prosecutor routinely outlined the facts of the case, the age of the victim, pointed or referred to the defendant, stated where the murder occurred, and how it occurred, on some occasions down to the number of stab wounds. Nonetheless, the prosecutor only asked if these jurors could "consider" a death sentence.
Defendant claims that these comments by the prosecutor were improper. However, the purpose of voir dire is to discover grounds for challenges for cause and to secure information for the intelligent exercise of peremptory challenges. State v. Stacy, 96-0221 (La.10/15/96), 680 So.2d 1175, 1178. A party interviewing a prospective juror may not ask a question or pose a hypothetical which would demand a commitment or prejudgment from the juror or which would pry into the juror's opinions about issues to be resolved in the case. State v. Thibodeaux, 98-1673 (La.9/8/99), 750 So.2d 916 State v. Williams, 230 La. 1059, 89 So.2d 898, 905 (1956). See also, State v. Square, 257 La. 743, 244 So.2d 200, 226 (1971), judgment vacated in part, 408 U.S. 938, 92 S.Ct. 2871, 33 L.Ed.2d 760 (1972), mandate conformed to, 263 La. 291, 268 So.2d 229 (1972) ("Voir dire examination is designed to test the competence and impartiality of prospective jurors and may not serve to pry into their opinions concerning evidence to be offered at trial."). However, voir dire examination which goes to the determination of the qualifications of prospective jurors by testing their competency and impartiality is proper. State v. Stacy, supra, 680 So.2d at 1178; State v. Hall, 616 So.2d 664, 668 (La.1993). This Court in State v. St. Amant, 413 So.2d 1312, 1319 (La.1981) held that "because of the difficulty of the concepts and values which must be understood and applied by each juror in his deliberations, counsel for each side is entitled to an opportunity to assess the personality and comprehension of each prospect as a unique human being before accepting him as a juror or challenging him for cause or peremptorily." See also State v. Dixon, 365 So.2d 1310 (La.1978). The proper scope of examination lies within the discretion of the trial court, and its ruling will not be disturbed on appeal in the absence of a clear abuse of discretion. State v. Stacy, supra, 680 So.2d at 1178; State v. Hall, supra, 616 So.2d at 668.
As to prospective jurors Simon, Stumps, Putman, and Angelle, the prosecutor's questions had a legitimate purpose in that they were aimed at determining whether the juror's attitudes about the *20 death penalty would render them unfit for service in this particular case and did not ask for a commitment to a particular verdict. Thus, defendant fails to demonstrate reversible error, and this portion of the assignment is without merit.
However, the prosecutor did indeed cross the line in his examination of prospective juror Collett when he asked for the juror's commitment to a particular verdict during the guilt phase of the trial:
STATE: Proof of first-degree murder, the elements, we've got to prove, one, that a man died. Follow me?
JUROR: Yes.
STATE: Check. If that's proven, check. Two, that the man died as the result of this defendant, armed robbery, first-degree robbery, or simple robbery, and that in the course of that he had specific intent to kill or to inflict great bodily harm. One, that the man died.
JUROR: Right.
STATE: And, more importantly, we have to prove that was him beyond a reasonable doubt. Follow me?
JUROR: Yes.
STATE: If we meet all those elements, Mr. Collett, what would your verdict be? (emphasis added)
DEFENSE: I'm going to object. He's asking him what his verdict would be.
COURT: Well, again, Mr. Hebert, since it's premised on the hypothec [sic] that they have proven all the essential elements of the crime, I don't think that that necessarily is an inappropriate question.
DEFENSE: Judge, it's still asking for a promise which what Mr. Clayton objected to me evoking a promise from these jurors and the Court sustained that objection. Now the Court is going to let him ask for a promise from ...
COURT: First of all, Mr. Hebert, I didn't hear the word promise.
DEFENSE: It's still evoking a commitment from this juror that he's going to vote guilty.
COURT: Note your objection, Mr. Hebert. Overruled.
Here, the trial court's ruling is erroneous. As discussed in length above, attorneys may not ask a question or pose a hypothetical which would demand a commitment or pre-judgment from the juror or which would pry into the juror's opinions about issues to be resolved in the case. State v. Thibodeaux, supra; State v. Williams, supra; State v. Square, supra. Here, the judge's ruling was incorrect and the trial court abused its discretion when it overruled the defendant's objection to the state's impermissible question. See State v. Hall, supra at 668; La.C.Cr.P. art. 786 (the scope of voir dire is within the sound discretion of the trial judge and his rulings will not be disturbed on appeal absent a clear showing of an abuse of discretion).
However, this ruling does not amount to reversible error. First, although this Court's jurisprudence suggests that to ask a juror for a commitment to a specific verdict is erroneous, few cases have resulted in reversal based on this kind of error. For instance, in State v. Young, 337 So.2d 1196 (La.1976) this Court held that a reference by the district attorney to a "promise" of the jurors that they would return a verdict of guilty if warranted by the facts was only a reminder by the prosecutor of the juror's sworn duty, and therefore did not rise to the level of reversible error. Similarly, in State v. Schouest, 351 So.2d 462 (La.1977), where the trial court overruled defendant's objection that the prosecutor asked prospective jurors whether they "would" convict under certain circumstances, this Court held that there was no error because the prosecutor was simply reminding the jury of its sworn duty. Secondly, Mr. Collett did not serve on the jury but was excused peremptorily by the defense and the defense makes no argument that he was forced to use his peremptory challenge on Mr. Collett rather *21 that a more questionable juror. Thus, any error committed by the trial court in refusing to sustain the defense's objection is harmless and does not warrant reversal. See State v. Taylor, 282 So.2d 491 (La.1973) (when two prospective jurors did not serve on the jury, the Court determined that no question addressed to them could have affected the verdict), rev'd on other grounds, Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). This portion of the assignment of error is without merit.[10]

ERRORS ALLEGED DURING THE GUILT PHASE

Other Crimes Evidence
In his third assignment of error, defendant claims that the trial court erred by allowing the state to present evidence of defendant's involvement in an unrelated armed robbery on the day of the offense. The state filed a pretrial motion seeking to present evidence that defendant had committed a robbery of a nearby store, Kean's Cleaners, several hours before the homicide of Mr. Brister. The court initially held the evidence admissible to establish intent to commit murder. The court based this on the police investigator's testimony that during the robbery of Kean's, defendant said he would kill the victim if she did not give him the money. However, on the eve of trial, the state filed an amended motion for a Prieur hearing in which it admitted that defendant told the victim, "give me the money and be quick about it," not "give me the money and I won't kill you." Consequently, the court ruled that absent any evidence showing an intent to kill in the Kean's robbery, it was not admissible in the state's case in chief. Nonetheless, the court also ruled that the state could introduce evidence of the Kean's robbery in rebuttal to any evidence of insanity offered by the defense. The defendant claims that the defense chose not to pursue the defense of insanity but instead focused on the theory that defendant was so intoxicated on crack at the time of the offense that he could not form specific intent to kill. In support of this theory, the defense relied on expert witness Dr. Kenneth Todd. Dr. Todd testified that defendant was so high on crack at the time of the offense that he did not have the capacity to "actively desire" the consequences of his actions at the time of the homicide. In reaching that conclusion, Dr. Todd reiterated what defendant had told police shortly after his arrest, that he had been smoking a large amount of crack at various locations on the day of the offense. After the doctor's testimony, the state again sought to introduce the Kean's robbery evidence, this time in rebuttal. The court ruled that the evidence was admissible to rebut the defense contention that "there was supposedly an unbroken period of time from about noon to the time of the offense when the defendant was engaged *22 in ingesting cocaine." According to defendant, no such factual presentation can be found in the doctor's testimony. Thus, defendant argues the trial court erred by allowing the state to introduce evidence of the Kean's robbery for impeachment purposes.
Generally, evidence of other crimes committed by the defendant is inadmissible due to the "substantial risk of grave prejudice to the defendant." State v. Prieur, 277 So.2d 126, 130 (La.1973). To admit "other crimes" evidence, the state must establish that there is an independent and relevant reason for doing so, i.e., to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act. Id. This Court has also held other crimes evidence admissible as proof of other crimes exhibiting almost identical modus operandi or system, committed in close proximity in time and place. State v. Ballard, 351 So.2d 484, 486-87 (La.1977). Evidence of other crimes, however, is not admissible simply to prove the bad character of the accused. La.C.E. art. 404(B)(1). Furthermore, the other crimes evidence must tend to prove a material fact genuinely at issue and the probative value of the extraneous crimes evidence must outweigh its prejudicial effect. La. C.E. arts. 403, 404(B)(1); State v. Hatcher, 372 So.2d 1024, 1033 (La.1979); State v. Sutfield, 354 So.2d 1334, 1337 (La.1978); State v. Jackson, 352 So.2d 195, 196 (La. 1977); State v. Ledet, 345 So.2d 474, 478 (La.1977). Thus, the trial court concluded that the Kean's robbery was not admissible in the state's case-in-chief.
Rebuttal evidence is that which explains, repels, disproves or counteracts. State v. Deboue, 552 So.2d 355, 362 (La.1989), cert. denied, 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 174 (1990); State v. Truitt, 500 So.2d 355, 359-360 (La.1987); State v. Huizar, 414 So.2d 741, 751 (La.1982). The determination of whether evidence is rebuttal evidence and hence admissible is an issue which is addressed to the sound discretion of the trial court. Huizar, supra; State v. Green, 390 So.2d 1253, 1260 (La.1980). Contradiction is one means of rebutting testimony of a witness. See generally State v. Garrison, 260 La. 141, 255 So.2d 719 (1971); State v. Poe, 214 La. 606, 38 So.2d 359 (1948).
Although defendant claims that Dr. Todd did not testify that defendant had smoked crack for an "unbroken period of time," he did testify as to defendant's actions on the day the crime occurred as related to him by defendant:
[Defendant] gets up on the morning of the 14th ... A friend of his named Lafayette comes over sometime around noon or just past noon, and Lafayette has some crack cocaine with him. They began to smoke crack cocaine. Things go downhill rapidly from there. They smoked crack cocaine Lafayette has. They buy some more crack cocaine with money Lafayette has. Then they buy crack cocaine with whatever money Donald has. They go to a location located on Brady Street and there is a number of, there is a dealer apparently at Brady Street, uh, putting out rocks of cocaine. The dealer is smoking. Donald and Lafayette are both smoking ... There are some disagreements about who owes what about the crack. People are trying to figure out who has got more money. They get some more crack cocaine and then they, the dealer tells him, I was just kidding you about some of that. And they're back. The mood changes once again and they're smoking more and more crack cocaine. At one point I believe Lafayette leaves and he comes back. This started, this episode started around noon. Eventually they go to their last location near some Mission Apartments on Mission ... There is additional money exchanged, more crack cocaine is smoked ... This is running up into the late afternoon. And our best time frame on this is that this all finishes around 5:30, 6:00 somewhere in the *23 vicinity ... And then at the Mission Apartments he [defendant] is so out of it that he does not recall leaving and he is not sure how much he used after that.... The next thing that he remembers is that a horn blows at him as he's crossing Chippewa Street which is very close to where the homicide takes place, very close to the Burger King. When the horn blows at him he is in a sense kinda woken up ... He goes to the phone booth and Donald tries to call his mama to pick him up. The phone was busy. He turns around, he sees the victim having pulled in the parking lot.
From his testimony, it is obvious that the jury could infer that defendant spent the entire day smoking cocaine at a variety of "crack houses". Indeed, although the doctor noted that he changed locations, there is no mention of the robbery of Kean's, nor any mention of where defendant obtained the money he used to fuel his crack binge. Consequently, the trial court correctly ruled that evidence of the Kean's robbery could be admitted to rebut the defense expert's version of the defendant's activities on March 14th, 1996.[11]See State v. Shipp, 30,562, p. 5 (La.App.2d Cir.4/8/98), 712 So.2d 230, 235, writ denied, 98-1199 (La.9/25/98), 724 So.2d 775 (police officer's testimony that defendant, who allegedly kidnapped, raped and shot his wife, and then shot himself, responded affirmatively when asked if he had ever attempted suicide, was proper rebuttal evidence, when offered to refute testimony by defendant that wife shot him, and to refute defendant's various accounts of what happened on night of crimes); State v. Hatter, 338 So.2d 100, 103 (La.1976)(in prosecution for armed robbery, testimony that accused had been seen dressed in yellow pants and in possession of small blue pistol six days after the robbery was admissible, on rebuttal, for purpose of contradicting accused's testimony that he never owned a gun and had never seen such pistol and that such pants, in which the pistol had been found, had been stolen from him); State v. Banks, 307 So.2d 594, 599 (La.1975)(evidence of other crimes is admissible in rebuttal if the accused affirmatively raises specific issues of fact which the otherwise inadmissible other-crime evidence becomes relevant to rebut); State v. Diggs, 261 La. 76, 78, 259 So.2d 18, 19 (1972)(where defendant's mother and sister testified that he had been home with them all day, some 25 blocks away from the scene of the crime, the trial court did not err when it admitted police officer's testimony on rebuttal, limiting it to a single question whether the patrolman had ever seen the defendant before the officer found him with the stolen vehicle); Cf. State v. Norfleet, 96-2122, p. 4 (La.App. 4th Cir.10/21/98), 721 So.2d 506, 510 (on rebuttal, state entitled to introduce evidence of incident in which defendant was disciplined for bringing knife to school where defendant placed his character in question by having witness testify that defendant was respectful, well-behaved, and not a discipline problem). Accordingly, the trial court did not err in ruling that evidence of the Kean's robbery was admissible on rebuttal and therefore this assignment of error lacks merit.

Evidence of Specific Intent
In his fifteenth assignment of error, the defendant argues that the evidence presented at his trial was insufficient *24 to establish that he had the specific intent to kill because he presented evidence that he was high on crack cocaine at the time of the offense. In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Captville, 448 So.2d 676, 678 (La.1984). To convict the defendant of first-degree murder, the state needed to prove (1) that the defendant had the specific intent to kill or inflict great bodily harm, and (2) that the victim was over the age of 65. R.S. 14:30. Moreover, this Court has consistently held that a mental defect, disorder, or condition short of insanity cannot negate specific intent and reduce the gravity of the offense. State v. Koon, supra; State v. Deboue, 552 So.2d 355 (La.1989), cert. denied, Deboue v. Louisiana, 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 174 (1990); State v. Lecompte, 371 So.2d 239 (La.1978); State v. Weber, 364 So.2d 952 (La.1978).
Though intent is a question of fact, it need not be proven as a fact; it may be inferred from the circumstances of the transaction. State v. Kahey, 436 So.2d 475, 487 (La.1983). It is clear from the circumstances detailed in the trial testimony that the defendant possessed the requisite specific intent to kill. No less than five witnesses saw the defendant stab the victim repeatedly. In addition, the severity and number of stab wounds clearly indicate an intent to kill or inflict great bodily harm. Furthermore, the record shows that the victim was 68 years old, well within the age limit of R.S. 14:30. Finally, although defendant presented evidence attempting to show that he was too high on crack cocaine at the time of the offense to form the necessary specific intent, the state also presented evidence tending to rebut this by showing that he had intentionally committed another offense on that same date. These are jury questions, and, after being properly instructed on the law applicable to the case, the jury found that defendant had the requisite specific intent to commit first-degree murder. Viewing this evidence in the light most favorable to the state, we find no error in the jury's finding. Accordingly, there is sufficient evidence to prove beyond a reasonable doubt each element of first-degree murder. This argument is meritless.

ERRORS ALLEGED DURING THE PENALTY PHASE

Victim Impact Testimony
In his twelfth assignment of error, the defendant asserts that the trial court erroneously admitted victim impact testimony by a nonfamily member and that the prosecutor elicited inflammatory testimony from the victim impact witnesses which went beyond the scope of testimony allowable under La.C.Cr.P. art. 905.2(A). La. C.Cr.P. art. 905.2(A) states in pertinent part: "The sentencing hearing shall focus on the circumstances of the offense, the character and propensities of the offender, and the impact that the death of the victim has had on family members." In State v. Bernard, 608 So.2d 966, 972 (La.1992), we defined the scope of allowable evidence under La.C.Cr.P. art. 905.2(A) as follows:
... some evidence of the murder victim's character and of the impact of the murder on the victim's survivors is admissible as relevant to the circumstances of the offense or to the character and propensities of the offender. To the extent that such evidence reasonably shows that the murderer knew or should have known that the victim, like himself, was a unique person and that the victim had or probably had survivors, and the murderer nevertheless proceeded to commit the crime, the evidence bears on the murderer's character traits and moral culpability, and is relevant to his character *25 and propensities as well as to the circumstances of the crime.
However, we cautioned that:
introduction of detailed descriptions of the good qualities of the victim or particularized narrations of the emotional, psychological and economic sufferings of the victim's survivors, which go beyond the purpose of showing the victim's individual identity and verifying the existence of survivors reasonably expected to grieve and suffer because of the murder, treads dangerously on the possibility of reversal because of the influence of arbitrary factors on the jury's sentencing decision. Whether or not particular evidence renders a hearing so fundamentally unfair as to amount to a due process violation must be determined on a case-by-case basis.
Bernard, 608 So.2d at 972. The admission of victim impact evidence which exceeds the scope of Bernard is reviewed under a harmless error standard. State v. Frost, 97-1771, p. 14 (La.12/1/98), 727 So.2d 417, cert. denied, Frost v. Louisiana, 528 U.S. 831, 120 S.Ct. 87, 145 L.Ed.2d 74 (1999).
This Court recently held in Frost, where the state presented victim impact testimony from two of the victim's neighbors, that the legislative history, along with the plain language of La.C.Cr.P. art. 905.2(A), as amended in 1994, limits the admission of victim impact evidence to testimony by family members only. There, we found that the introduction of victim impact testimony from nonfamily members constituted harmless error because the content of the testimony came within the parameters set by State v. Bernard, supra, and in part because the trial court charged jurors that the witness was called simply to establish the specific harm caused by the defendant's actions and not to decide the penalty. Frost, 97-1771 at p. 15, 727 So.2d at 430 .
Although one of the witnesses at issue in the instant case, Ms. Vallie Mills, was the victim's fiancé and his long-time companion, she does not technically qualify as "family" under either a traditional or a legal definition of the word. See Webster's New Collegiate Dictionary 414 (G. & C. Merrimam Co.1977)(a group of persons of common ancestry); Black's Law Dictionary 728 (West 1968) ("In most common usage, the work implies father, mother, and children, immediate blood relatives.") (citation omitted). However, considering that she was his fiancé and his long-time companion, the fact that they were not married seems irrelevant when considering the permissible bounds of Bernard, e.g., to show the impact of the murder on the victim's survivors. Further, even if she is not considered a family member, the admission of her testimony was harmless.
During the penalty phase, the state called four witnesses: a fingerprint expert, the victim in the defendant's armed robbery of Kean's, Ms. Kimberly Jackson (the victim's daughter), and finally Ms. Mills. Ms. Mills began by telling jurors how she met the victim 15 years earlier at a party. She described the victim as "a good person, good provider. Anything he could do for you he would do it." The witness also spoke of the victim's concern for her children and his close relationship with her family. Ms. Mills then testified that the victim took her son to basketball games, the movies and wrestling matches. She told jurors that the victim's death has effected her sleep, that she worries all the time, and that the face of the defendant is always in her mind. She also testified that the victim's death had caused her financial concern. She concluded by saying, "[defendant] killed a good man for no reason, for no reason. All we had is gone ... I miss that man so much." In addition, the defendant argues that the testimony of Kimberly Jackson, the victim's daughter, went beyond the scope of Bernard. Jackson testified that the victim would take her and her son bowling, that he would give her rides to work, and she even testified as to what his favorite foods were. She ended her testimony by stating that if she could say one thing to her father before he *26 died, she would tell him that she loved him.
We find that this evidence does not fall outside the parameters of Bernard as it did not go "beyond showing the victim's individualized identity and verifying the existence of survivors reasonably expected to grieve and suffer." Further, this victim impact testimony was not lengthy. This Court has considered that where the amount of victim impact testimony presented is small, that will be a factor in determining whether the admission of such testimony constitutes reversible error. State v. Williams, 96-1023 (La.1/21/98), 708 So.2d 703, cert. denied, Williams v. Louisiana, 525 U.S. 838, 119 S.Ct. 99, 142 L.Ed.2d 79 (1998). For example, the penalty phase in Williams lasted one day and while the victim impact evidence occupied ten pages of the transcript, the presentation of evidence in mitigation by the defense totaled nearly 72 pages. In the instant case, testimony by victim impact witnesses occupied only seven of the 210-page transcript of testimony taken during the penalty phase. Testimony by defense witnesses totaled 171 pages.[12] In addition, in ascertaining whether there was any prejudicial effect on the defendant, we note that the jury was properly charged concerning the weight to be afforded the victim impact testimony.
Accordingly, considering all of the above, we find no error in the admission of Ms. Jackson's testimony and we find that even if Ms. Mills cannot be considered a "family member," her testimony did not fall outside the scope of Bernard. Therefore, we find that the jury's verdict was surely unattributable to the admission of that evidence, if it was in fact erroneous.

CAPITAL SENTENCE REVIEW
Under La.C.Cr.P. art. 905.9 and La.S.Ct.R. 28, this Court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, the Court considers whether the jury imposed the sentence under influence of passion, prejudice, or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender. In the instant case, the trial court has submitted a Uniform Capital Sentence Report ("UCSR"), and the Department of Public Safety and Corrections ("DOC") has submitted a Capital Sentence Investigation Report ("CSI"). In addition, the state submitted a Sentence Review Memorandum.
The CSI indicates that defendant is a black male born on August 21, 1960. He was 36 years old at the time of the offense. He was born in Baton Rouge, Louisiana. His parents died when he was approximately three months old. He was raised by his foster parents, Albert and Victoria Carter. Mr. Carter worked as a plasterer, and Ms. Carter was a housewife. Defendant himself admits that he did not suffer any abuse as a child. His foster parents lived in an upper middle class neighborhood in the Mayfair Subdivision of Baton Rouge. They were divorced when the defendant was in 12th grade. He attended Mayfair Elementary School and had good grades. Defendant then attended Lee High School and graduated. Defendant claims that he went to Louisiana Tech University on a basketball scholarship for two years, but his foster father stated that although his son had practiced with the *27 basketball team, a leg injury prevented him from playing.
In 1982, the defendant married Sandra Henry. He is also the father of two children. Although defendant is now divorced, he told the DOC investigator that his relationship with his wife was good except for the times he was using crack cocaine. However, the report also indicates that the defendant's wife was listed as the victim in three separate assaultive events. The cases were not prosecuted because the victim either declined to prosecute or did not answer letters from the District Attorney's Office. In addition, the defendant's criminal history involves a 1979 guilty plea for felony theft and a 1993 plea of guilty to simple burglary. Defendant was on probation for the burglary when the instant offense was committed. The defendant also failed to report to his probation officer as directed, moved without permission, submitted no proof of employment, possessed a dangerous weapon (knife), did not submit monthly supervision reports as directed, failed to pay fines and fees, submitted no proof of a substance abuse evaluation, submitted no proof that he attended AA or NA meetings twice a week, and submitted no proof of completion of community service.
According to defendant, he first started using crack cocaine in 1985, and by 1987 he was smoking crack approximately twice a month. He stated that he started to smoke while he was playing semi-pro basketball and the other players introduced him to the drug. As time went on he became more and more addicted. However, defendant also claims that he had a three- or four-year-period of sobriety. He stated that he has been through numerous drug treatment programs, both inpatient and out patient. According to the CSI, defendant's treatment programs have been both religious and secular in nature, but none of the programs appear to have benefitted the defendant on a long-term basis. In fact, on three occasions, defendant left drug treatment programs early for various reasons. Defendant also claimed that he was treated in drug abuse counseling for suicidal depression and that he was given Siniquine, but did not want to take it because he "wanted to get off all drugs completely."
Before the instant crime occurred, the defendant was a minister at the True Vine Ministries for two or three years. He had also begun to minister while incarcerated in the East Baton Rouge Parish Prison.
The Department of Corrections contacted members of the defendant's family in order to obtain a more complete record of defendant's social history. They spoke with defendant's foster father. He stated that the defendant had the usual problems while growing up, things like fights and problems with teachers, but claimed that these only happened once and a while. The DOC also contacted Pastor Washington at True Vine Ministries who confirmed that the defendant had been a minister and associated minister at his church. He also told DOC investigators that defendant was a good man when he wasn't on drugs. The DOC could not locate defendant's foster mother or his ex-wife.
The USCR indicates that the defendant suffers from "psychoactive substance induced mood disorder," cocaine dependancy, and depressive disorder. The report also indicates that the defendant was under the influence of narcotics, specifically crack cocaine, when he committed the instant offense. The report shows that the victim of the crime was killed during the commission of an armed robbery, that the victim was 65 years of age or older, and that the offense was committed in an especially heinous, atrocious, or cruel manner.

Passion, Prejudice, and other Arbitrary Factors
Defendant argues that a number of matters injected arbitrary factors into the proceedings. The claims are treated under the individual assignments of error. All of these arguments are addressed in depth *28 above and in the unpublished appendix and are meritless.

Aggravating Circumstances
At trial, the state argued that three aggravating circumstances existed: (1) that the offender was engaged in the perpetration or attempted perpetration of aggravated burglary or armed robbery; (2) that the victim was 65 years of age or older; and (3) the offense was committed in an especially heinous, atrocious, or cruel manner. La.C.Cr.P. art. 905.4(A)(1),(5),(7). The jury found the existence of all three circumstances.
The record fully supports a finding that the instant murder was committed in the course of an armed robbery or simple robbery and that the victim was 65 years of age or older. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Even accepting the defendant's claim treated in the unpublished appendix, that the evidence failed to support that the murder was "committed in an especially heinous, atrocious, or cruel manner," the inclusion of this aggravating circumstance did not interject an arbitrary factor into these proceedings because evidence of the manner in which the offense was committed and of the nature of the victim's injuries were all relevant and properly admitted at trial. See State v. Roy, 95-0638 (La.10/04/96), 681 So.2d 1230, 1242.

Proportionality
Although the federal Constitution does not require a proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990), cert. denied, Burrell v. Louisiana, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991). This Court, however, has vacated only one capital sentence on the ground that it was disproportionate to the offense and the circumstances of the offender, State v. Sonnier, 380 So.2d 1, 7 (La.1979), although it effectively decapitalized another death penalty reversal on other grounds. See State v. Weiland, 505 So.2d 702 (La.1987) (on remand, the state reduced the charge to second-degree murder and the jury returned a verdict of manslaughter).
This Court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. Sonnier, supra.
Jurors in the Nineteenth Judicial District Court, which comprises East Baton Rouge Parish, have recommended imposition of the death penalty on approximately 22 occasions, including the current case. Several of the salient features of the instant case make it similar enough to other death sentences recommended by juries in the 19th JDC that defendant's sentence is not disproportionate. See e.g. State v. Jacobs, Docket No. 12-94-554 (appeal pending)(defendant shot and killed a 68-year-old man during the course of an armed robbery in the parking lot of a local restaurant); State v. Frost, supra (defendant, an employee at Howard Johnson's Hotel, stabbed the night auditor to death and stole the contents of the cash box); State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278 (defendant broke into the victims' home, armed himself with a kitchen knife, and stabbed the two elderly victims to death) (convictions reversed and sentences vacated; trial court erred in failing to sustain defendant's challenge for cause to an objectionable juror); State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8 (convictions and sentences affirmed), cert. denied, Robertson v. Louisiana, 525 U.S. 882, 119 S.Ct. 190, 142 L.Ed.2d 155 (1998); State v. Williams, 383 So.2d 369 (La.1980) (defendant shot and killed the victim during *29 an armed robbery of an A & P Grocery Store).
Furthermore, considering the fact that this case is an armed robbery and the cases are legion in which this Court has affirmed capital sentences based primarily on the jury's finding that the defendant killed the victim in the course of an armed robbery, we conclude that the sentence of death is not disproportionate in this case. See e.g. State v. Wessinger, 98-1234 (La.5/28/99), 736 So.2d 162, cert. denied, Wessinger v. Louisiana, ___ U.S. ___, 120 S.Ct. 589, 145 L.Ed.2d 489 (1999) (defendant shot and killed two people, and injured two people during the course of an armed robbery); State v. Broadway, 96-2659 (La.10/19/99), 753 So.2d 801, cert. denied, Broadway v. Louisiana, ___ U.S. ___, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000) (defendant and co-defendant shot and killed police officer escorting grocery store manager who was making a night deposit); State v. Brumfield, 96-2667 (La.10/28/98), 737 So.2d 660, cert. denied, Brumfield v. Louisiana, 526 U.S. 1025, 119 S.Ct. 1267, 143 L.Ed.2d 362 (1999) (defendant and codefendant shot and killed police officer escorting grocery store manager who was making a night deposit); State v. Williams, 96-1023 (La.1/21/98), 708 So.2d 703, cert. denied, Williams v. Louisiana, 525 U.S. 838, 119 S.Ct. 99, 142 L.Ed.2d 79 (1998) (defendant murdered victim while attempting to rob him in his truck; earlier that day, defendant had shot and wounded another victim during the attempted perpetration of an armed robbery); State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, cert. denied, Taylor v. Louisiana, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996) (during armed robbery of the Cajun Fried Chicken restaurant where defendant had previously been an employee, he shot and killed one employee and shot and permanently disabled and paralyzed another); State v. Scales, 93-2003 (La.5/22/95), 655 So.2d 1326, cert. denied, Scales v. Louisiana, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996) (defendant, while engaged in the armed robbery of a Church's Fried Chicken, shot and killed one of the employees); State v. Craig, 95-2499 (La.5/20/97), 699 So.2d 865, cert. denied, Craig v. Louisiana, 522 U.S. 935, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997) (defendant kidnapped the victim while stealing his truck and ultimately drove him to a secluded area and shot him three times in the head)[13]. Thus, although counsel argues correctly in his Sentence Review Memorandum that proportionality review should include all similar first-degree murder prosecutions including those which resulted in noncapital verdicts and/or sentences, the relevant pool of capital sentences based in part or entirely on armed robbery murder is now so large that this defendant's sentence does not reflect the wanton and freakish infliction of capital punishment no matter how large the relevant pool of similar noncapital cases.

DECREE
For the reasons assigned herein, defendant's conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) defendant fails to petition timely the *30 United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under their prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this Court under La.Code Crim. Proc. Art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La.Rev.Stat. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La.Rev.Stat. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
AFFIRMED.
NOTES
[*] Johnson, J., not on panel. Rule IV, Part 2, § 3.
[1] Assignments of error not treated in this opinion are addressed in an Unpublished Appendix to this opinion.
[2] Carol Simon, Juror # 128 (Black); Sheryln Taylor, Juror # 137 (Black); India Spears, Juror # 152 (Black); Willie Ennis, Juror # 58 (Black); Ronald Perkins, Juror # 110 (Black); Henry Cage, Juror # 28 (Black); Mary Nola, Juror # 107 (White).
[3] Ora Hernandez, Juror # 70 (White); Patricia Stone, Juror # 134 (White); Samuel London, Juror # 91 (Black); Eddie August, Juror # 9 (Black).
[4] These reasons constituted "legitimate" grounds for the exercise of a peremptory strike. Purkett v. Elem, 115 S.Ct. at 1771. In Purkett, the United States Supreme Court explained that what Batson means by a "legitimate reason" is not necessarily a reason that makes sense, but a reason that does not deny equal protection.
[5] The prosecutor's argument is correct. It is the effect of the body language on the perception of the prosecutor, not the trial judge, that is important.
[6] Notably, after the trial court's ruling, the prosecutor sought to withdraw the peremptory strike against Mr. August. The trial court denied the prosecutor's request.
[7] At the hearing on defendant's motion for new trial, when asked about this holding, the trial judge explained that the state had said that Mr. August had made certain statements during voir dire and she was referring to the fact that if the transcript showed he didn't make those statements, the state would have to live with that.
[8] We note that the defense later exercised a peremptory challenge against Mr. Fountain.
[9] The defendant also points to another impermissible question to Ms. Simon. Although the state did pose an arguably impermissible question, the court sustained defense counsel's objection and the state promptly withdrew the question. In State v. Deboue, 552 So.2d 355, 362 (La.1989), cert. denied, 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 174 (1990), this Court stated that when an objection to a remark which has been challenged as prejudicial is promptly sustained, the likelihood that the remark somehow influenced the jury is lessened. See also State v. Sharp, 418 So.2d 1344, 1349 (La.1982). The trial judge's reciting that the remark was improper and her sustaining of the objection, coupled with the state's withdrawal of the question, strongly indicate that the prosecutor's remark did not influence this juror's ability to render an impartial verdict. Consequently, the error was corrected during the voir dire and defendant does not demonstrate any dereliction on the part of trial court with respect to this particular ruling.
[10] The defendant also complains of several comments made by the prosecutor, describing the facts of the case, where no objection was made by defense counsel. This Court has traditionally applied La.C.Cr.P. art. 841 to errors occurring during voir dire. It has consistently held that a defendant waives review of irregularities in the selection of the jury when an objection is not timely raised. See State v. Potter, 591 So.2d 1166, 1168-69 (La. 1991) (failure to make Batson objection waived issue on appeal); State v. Spencer, 446 So.2d 1197, 1200 (La.1984) (review of improper exclusion of blacks from jury not preserved for appeal); State v. Whitt, 404 So.2d 254, 260 (La.1981) (objection to failure to sequester jury at an earlier time waived); State v. Bazile, 386 So.2d 349, 351 (La.1980) (improper procedure for selecting venire not reviewable where objection was made after jury was sworn). This procedural default rule applies to the guilt phase of a capital trial. State v. Taylor, 93-2201, p. 7 (La.2/28/96), 669 So.2d 364; see also State v. Wessinger, 98-1234 (La.5/28/99), 736 So.2d 162 (extending this procedural default rule to the penalty phase of capital trials after May 28, 1999). In this same assignment of error, the defendant also claims that the trial judge erroneously handled the issue of exercising peremptory strikes, ruling that the parties were not allowed to use them at a certain point during jury selection even though all 12 members of the jury has not yet been sworn. However, defense counsel did not lodge an objection, and in fact, agreed to the trial court's ruling.
[11] We note that given that the defense expert claimed that defendant was too intoxicated on crack cocaine to form specific intent, the court also could have properly admitted the evidence of the prior incident to demonstrate motive and intent. See State v. Monroe, 364 So.2d 570, 573 (La.1978) (other crimes evidence admissible to show requisite specific intent for second degree murder when defendant claimed killing resulted from self-defense and insanity); State v. Griffin, 618 So.2d 680, 688 (La.App. 2 Cir.1993) (evidence of "other crimes" was of probative value on the issues of defendant's intent, opportunity, preparation, plan, knowledge, identity, and absence of mistake or accident given that her defense was that her "crack" intoxication prevented her from forming the requisite specific intent).
[12] However, a footnote in Williams, cautioned that "[a]lthough we have mentioned the number of witnesses and the number of pages of transcript in our analysis, we have not entered into a quantitative analysis of how much information was put on by the state and the defendant in determining the likelihood of harm to the defendant. Rather, we only mention these numbers as illustrations of what evidence was presented during the penalty phase." Id., 96-1023 at p. 24, fn. 17, 708 So.2d at 720.
[13] Three other similar cases ultimately ended in reversal of the defendant's death sentence, removing them from consideration in proportionality review. See State v. Clark, 492 So.2d 862 (La.1986) (original sentence of death set aside and life imposed after reversal, defendant shot and killed an employee of Studebaker's Lounge while engaged in an armed robbery); State v. Clark, 387 So.2d 1124 (La.1980), cert. denied, 449 U.S. 1103, 101 S.Ct. 900, 66 L.Ed.2d 830 (1981), reversed in habeas proceedings, Clark v. Louisiana State Penitentiary, 694 F.2d 75 (5th Cir. 1983) (defendant stabbed and shot the night manager of the Red Lobster Restaurant to death during an armed robbery; after federal habeas corpus relief, he pled to a life sentence); State v. Williams, 392 So.2d 619 (La. 1980) (defendant, while robbing an Exxon service station, shot and killed an employee; jury recommended death, however, sentence was reversed, and after remand, the jury recommended life).