PETTIGREW, J.
|2Pefendant, William Anthony Henderson, was charged by grand jury indictment with one count of first degree murder, a violation of La. R.S. 14:30. He pled not guilty. He was later recharged by an amended grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1 (count one); second degree cruelty to juveniles, a violation of La. R.S. 14:93.2.3 (count two); and cruelty to juveniles, a violation of La. R.S. 14:93 (count three). He pled not guilty to all counts. Finally, on the day of trial, the State amended count two to charge defendant with cruelty to juveniles, a violation of La. R.S. 14:93. Defendant was rearraigned on, and pled not guilty to, all counts. After a jury trial, defendant was found guilty as charged on all counts. The trial court denied defendant’s motions for postverdict judgment of acquittal and new trial. For his conviction on count one, defendant was sentenced to the mandatory term of life imprisonment at hard labor, without the benefit of parole, probation, or suspension of sentence. For each of his convictions on counts two and three, defendant was sentenced to ten years imprisonment at hard labor. The trial court ordered all sentences to run concurrently. Defendant now appeals, alleging six assignments of error. For the following reasons, we affirm defendant’s convictions and sentences.
*41 FACTS
Late in the evening on October 29, 2009, in Chauvin, defendant and his live-in girlfriend, Kimberly Nelton, left Nelton’s two children, ten-month-old K.N.[1] and two-year-old K.H., home alone while they visited with neighborhood friends. Around 11:00 p.m. that night, they put the children to bed and walked next door to Farrell Goffs house, where they began to drink alcohol. As more people began to show up at Goffs home, the party moved down the street to Chris Duplantis’s house. Defendant and Nelton followed the party to Du-plantis’s house, where they both became more intoxicated as the night continued. Shortly before defendant and Nelton were to leave the party, they got into a disagreement about whether defendant was too drunk to |sdrive Nelton’s car. Upset, defendant began walking home alone. Nelton stayed to help Duplantis look for his keys, arid she eventually brought him to a friend’s apartment to retrieve them before she returned home herself around 3:30 a.m., approximately one-half hour after defendant had left Duplantis’s house. When Nelton got home, she noticed that K.H. had been moved onto the living room sofa and that KN.’s playpen had been moved from the bedroom into the living room. She did not check on the children because she did not hear them crying.
The next morning, Nelton was awoken at 10:05 a.m. by a phone call from the food stamp office. Nelton took the call in the bathroom, where she was changing KH.’s diaper. While Nelton was on the phone, defendant approached her and said that K.N. was not breathing. She immediately called 911, but paramedics were unable to revive the child because he had already been deceased for some time before they arrived.
Dr. Susan Garcia of the Jefferson Parish Forensic Center performed the autopsy of K.N. and testified at trial as an expert in forensic pathology. Based on her observations, Dr. Garcia testified that K.N. died as a result of suffocation due to external force, making his death a homicide. In addition to the cause of death as suffocation, Dr. Garcia noted a number of bruises around KN.’s face and neck area that indicated to her that some force was placed on the front of his face. She also observed that K.N. had recent breaks in each of his forearms and on his left ribcage. Dr. Garcia further testified that K.N. had lacerations to his right nostril and to his frenulum, the latter of which indicated manual compression of his face. She also noted lividity on KN.’s back, indicating that he probably had lain on his back for two to four hours after his death.
Defendant did not testify at trial, but he did make a statement to the police that was played for the jury. Initially, he told detectives that he and Nelton put the children to sleep at 11:00 p.m. and went to bed themselves shortly thereafter. However, he then admitted to leaving the children home alone so that he and Nelton could visit their neighbors. Defendant stated that when he arrived home before Nelton, he moved the children from the bedroom to the living room and simply went to sleep. After further questioning, defendant admitted that K.N. was crying when he got home and that he | ¿attempted to quiet him by grabbing his face and telling him to shut up. He explained the bruising on KN.’s head and mouth area by saying that he slipped and fell while carrying him. Defendant’s story changed throughout the *42 interview about whether K.N. continued to cry after he was placed in the living room. Initially, defendant said that K.N. cried for awhile after defendant laid him back in his playpen. However, defendant later stated that K.N. stopped crying after he tried to hush him. He also told detectives that K.N.’s hand twitched as he held his hand over K.N.’s mouth. After defendant put K.N. into his playpen, he covered the child with a blanket from head to toe.
At trial, the jury heard testimony from Detective Michelle Blades of the Terre-bonne Parish Sheriffs Office, who stated that defendant’s house had no running water at the time of the incident and that the sole toilet in the residence was filled with feces and dirty tampons. She also described the condition of Nelton’s two-year-old son, K.H., who had extensive bruising on his thighs, back, chest, and head. Nel-ton testified at trial that defendant would physically discipline K.H. and that he occasionally left marks on the child as a result.
Mary Chauvin, defendant’s former sister-in-law, testified at trial that she had previously seen defendant abuse K.N. by yelling at him and violently bouncing the child on a trampoline. She also confirmed that K.H. was covered in bruises when she saw him on October 20, 2009. After a jury trial, defendant was convicted of the second degree murder of K.N., cruelty to juveniles related to his treatment of K.N., and cruelty to juveniles related to his treatment of K.H.
ASSIGNMENT OF ERROR # 1
In his first assignment of error, defendant' contends that the trial judge erred in denying his challenge for cause of prospective juror Jill Allen. Specifically, he alleges that Jill Allen was unqualified to serve as a juror because she stated that she would give more weight to the testimony of a police officer as opposed to that of an ordinary citizen.
The State or the defendant may challenge a juror for cause on the ground that the juror is not impartial, whatever the cause of his partiality. An opinion or impression [Sas to the guilt or innocence of the defendant shall not of itself be a sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence. La.Code Crim. P. art. 797(2). A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the prospective juror’s responses as a whole reveal facts from which bias, prejudice, or inability to render judgment according to the law reasonably may be inferred. However, the trial court is vested with broad discretion in ruling on a challenge for cause; its ruling will not be disturbed on appeal absent a showing of an abuse of discretion. State v. Henderson, 99-1945, p. 9 (La.App. 1 Cir. 6/23/00), 762 So.2d 747, 754, writ denied, 2000-2223 (La.6/15/01), 793 So.2d 1235.
In order for a defendant to prove reversible error warranting reversal of both his conviction and sentence, he need only show the following: (1) erroneous denial of a challenge for cause; and (2) use of all his peremptory challenges. Prejudice is presumed when a defendant’s challenge for cause is erroneously denied and the defendant exhausts all his peremptory challenges.[2] An erroneous ruling depriving an accused of a peremptory challenge *43 violates his substantial rights and constitutes reversible error. State v. Taylor, 2003-1884, pp. 5-6 (La.5/25/04), 875 So.2d 58, 62. A trial judge’s refusal to excuse a prospective juror for cause is not an abuse of his discretion, notwithstanding that the juror has voiced an opinion seemingly prejudicial to the defense, when subsequently, on further inquiry or instruction, he has demonstrated a willingness and ability to decide the case impartially according to the law and the evidence. Taylor, 2003-1834 at 6, 875 So.2d at 63.
At the time of trial, Jill Allen was twenty-nine years old and a mother of two young children. Her husband worked as an emergency room physician, and he also served as a member of a SWAT team. During voir dire, Ms. Allen noted that she was an acquaintance of the wife of Matt Hagen, one of the prosecuting assistant district | Rattorneys. She also stated that she knew the coroner, Dr. Victor Tedesco, because her husband occasionally worked with him. Ms. Alien also responded, somewhat ambiguously, that her cousin was either the victim or the perpetrator of a first degree murder in Tennessee. In response to further questioning on each of these relationships, Ms. Alien stated that they would not in any way affect her ability to be fair and impartial and that she would make her decision on the verdict based on the evidence and law in the case.
Defense counsel then asked Ms. Allen how she would respond if two different witnesses testified to different facts at trial. The following colloquy took place:
Ms. Allen: Back to basically what you said. If it’s just an everyday someone like me and then a policeman on the stand, with my husband in law enforcement I would tend to lean towards — If that’s all the evidence I have to go on, I would lean more towards what the officer testified under oath than I, than I would just Joe.
Defense counsel: Every single time?
Ms. Allen: No. I’m just telling you what I would lean towards on the majority, due to the fact that my husband is in law enforcement.
Defense counsel: You said — I believe you indicated that he was in S.W.A.T. in Lafourche? Is that what it was?
Ms. Allen: Yes.
Defense counsel: How long has he been doing that?
Ms. Allen: Five years.
Ms. Allen was later individually voir dired because of a concern that she may have had independent knowledge of the case due to the fact that her husband worked with the coroner’s office. However, Ms. Allen stated that she did not speak with her husband about his cases. She was never explicitly rehabilitated on her statements relating to the credibility of law enforcement.
Defense counsel challenged Ms. Allen for cause, arguing that her statements indicated that she would automatically find law enforcement witnesses more credible than lay witnesses simply because of their status. In response, the State argued that while Ms. Allen had said that she might lean to believe law enforcement officers, she had previously responded several times during voir dire that she would listen to all the 17evidence and weigh the credibility of the witness. The trial court agreed with the State and denied defendant’s challenge for cause, finding that Ms. Allen had repeatedly answered in the affirmative that she could be fair and impartial, The defense later peremptorily challenged Ms. Alien. •
Generally, an individual who will unquestionably credit the testimony of law enforcement officers over that of de *44 fense witnesses is not competent to serve as a juror. State v. Kang, 2002-2812, p. 4 (La.10/21/03), 859 So.2d 649, 652. However, a mere relationship between a prospective juror and a law enforcement officer is not of itself grounds to strike the juror for cause. Kang, 2002-2812 at 5, 859 So.2d at 653.
When assessing whether a challenge for cause should be granted, the district judge must look at the juror’s responses during his or her entire testimony, not just “correct” isolated answers or, for that matter, “incorrect,” isolated answers. State v. Lee, 559 So.2d 1310, 1318 (La. 1990) cert. denied, 499 U.S. 954, 111 S.Ct. 1431, 113 L.Ed.2d 482 (1991). A challenge for cause should be granted, however, even when a prospective juror declares his ability to remain impartial, if the juror’s responses as a whole reveal facts from which bias, prejudice or inability to render a judgment according to law may be reasonably implied. Kang, 2002-2812 at 5, 859 So.2d at 653.
In response to questioning from defense counsel, Ms. Allen stated that she might be more inclined to believe a law enforcement witness than a lay witness because of her relationship with her husband. However, she did state that she would not hold such a belief “every single time.” While Ms. Allen’s response to this question may not have been perfect, the trial judge concluded that it did not disqualify her as a potential juror. In coming to that conclusion, he had the opportunity to evaluate her previous responses throughout her extensive voir dire, and he noted that in every other instance she had affirmed her ability to sit as a fair and impartial juror and to decide defendant’s case on the evidence and law before her. On the record before us, we cannot conclude that the that judge abused his discretion in denying defendant’s challenge for cause of Ms. Allen.
This assignment of error is without merit.
| ^ASSIGNMENT OF ERROR # 2
In his second assignment of error, defendant argues that the trial court erred in denying his Batson[3] challenges alleging that the State exercised a pattern of racial discrimination by using its peremptory challenges to exclude African Americans from defendant’s jury.
In Batson, 476 U.S. at 96-98, 106 S.Ct. at 1723-1724, the United States Supreme Court outlined a three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause. State v. Mitchell, 99-0283, p. 7 (La.App. 1 Cir. 6/22/01), 808 So.2d 664, 669. Under Batson, a defendant must first establish a prima facie case of discrimination by showing facts and relevant circumstances that raise an inference that the prosecutor used his peremptory challenges to exclude potential jurors on account of their race. State v. Tilley, 99-0569, p. 4 (La.7/6/00), 767 So.2d 6, 12, cert. denied, 532 U.S. 959, 121 S.Ct. 1488, 149 L.Ed.2d 375 (2001). The combination of factors needed to establish a prima facie case are: (1) the defendant must demonstrate that the prosecutor’s challenge was directed at a member of a cognizable group; (2) the defendant must then show the challenge was peremptory rather than for cause; and (3) finally, the defendant must show circumstances sufficient to raise an inference that the prosecutor struck the prospective juror on account of race. State v. Myers, 99-1803, p. 4 (La.4/11/00), 761 So.2d 498, 501.
*45 The defendant may offer any facts relevant to the question of the prosecutor’s discriminatory intent. Such facts include, but are not limited to, a pattern of strikes by a prosecutor against members of a suspect class, statements or actions of the prosecutor during voir dire that support an inference that the exercise of peremptory strikes was motivated by impermissible considerations, the composition of the veni-re and of the jury finally empanelled, and any other disparate impact upon the suspect class that is alleged to be the victim of purposeful discrimination. State v. Rodriguez, 2001-2182, |ap. 6 (La.App. 1 Cir. 6/21/02), 822 So.2d 121, 128, unit denied, 2002-2049 (La.2/14/03), 836 So.2d 131.
No formula exists for determining whether the defense has established a pri-ma facie case of purposeful discrimination. A trial judge may take into account not only whether a pattern of strikes against African-American prospective jurors has emerged during voir dire, but also whether the prosecutor’s questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. Rodriguez, 2001-2182 at 6-7, 822 So.2d at 128.
If the requisite showing has been made by the defendant, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. The second step of this process does not demand an explanation that is persuasive, or even plausible. At the second step of the inquiry, the issue is the facial validity of the prosecutor’s explanation. Unless a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered will be deemed race neutral. Mitchell, 99-0283 at 7, 808 So.2d at 669-670. This is a burden of production, not one of persuasion. State v. Harris, 2001-0408, p. 4 (La.6/21/02), 820 So.2d 471, 473.
Faced with a race-neutral explanation, the defendant then must prove to the trial court purposeful discrimination. The proper inquiry in this final stage of the Batson analysis is whether the defendant’s proof, when weighed against the prosecutor’s proffered race-neutral reasons, is sufficient to persuade the trial court that such discriminatory intent is present. Thus, the focus of the Batson inquiry is upon the intent of the prosecutor at the time he exercised his peremptory strikes. Tilley, 99-0569 at 5, 767 So.2d at 12. The ultimate burden of persuasion is on the defendant. State v. Young, 551 So.2d 695, 698 (LaApp. 1 Cir.1989). The trial court should examine all of the available evidence in an effort to discern patterns of strikes and other statements or actions by the prosecutor during voir dire that support or reject a finding of discriminatory intent. Tilley, 99-0569 at 5, 767 So.2d at 12-13.
We note first that of the forty-eight prospective jurors voir dired between two panels, only four — Linda Barrow, Eugene Sanders, April Hawkins, and Wanda Westley — [identified^ their race as African American. After the voir dire of panel one, the State peremptorily challenged Ms. Barrow, and she was excused. After the voir dire of panel two, the State peremptorily challenged Mr. Sanders. Immediately thereafter, defense counsel urged a Batson objection on the ground that the State had peremptorily challenged the only two African-American prospective jurors tendered for service to that point. The trial court asked the State to give its reasons for challenging these prospective jurors. The State replied that it challenged Mr. Sanders because he indicated that he had to give his sister insulin and that might cause him to become unavailable at *46 some point during the week. The State further offered that Mr. Sanders had indicated that it might be difficult for him to sit in judgment of the defendant and to send him to jail. With respect to Ms, Barrow, the State replied that her son had been convicted of aggravated rape and kidnapping and that she believed her son had been mistreated. The State also noted that she had health issues that might affect her ability to serve on the jury and that she appeared to have her eyes closed at times during voir dire.
The trial judge denied defendant’s Batson challenge, noting that the State had established independent grounds for challenging both jurors. Considering the record as a whole, we cannot conclude that the trial judge erred in denying this Bat-son objection. The State offered race-neutral reasons for striking each challenged juror, and defendant did not offer any specific evidence of purposeful discrimination outside of the fact that the State had peremptorily challenged the only two African-American prospective jurors tendered for service. A defendant’s reliance on bare statistics to support a prima facie case of race discrimination is misplaced. See State v. Duncan, 99-2615, p. 24 (La.10/16/01), 802 So.2d 533, 550, cert. denied, 536 U.S. 907, 122 S.Ct. 2362, 153 L.Ed.2d 183 (2002).
After the trial court denied defendant’s first Batson objection, jury selection continued. Both the State and the defense accepted Ms. Hawkins as a juror. However, the State peremptorily challenged Ms. Westley, and defense counsel again urged a In Batson objection, arguing that she was the third of three African-American prospective jurors that the State had peremptorily challenged. The State then pointed out that Ms. Westley was actually the fourth African-American prospective juror between the panels and that it had accepted Ms. Hawkins as a juror. The trial court asked the State if it had a reason for excusing Ms. Westley, but the State argued that there was actually no pattern sufficient to support a prima facie claim of racial discrimination. The trial court agreed with the State and denied defendant’s second Batson objection.
Here, again, defendant’s only support for a prima facie claim of racial discrimination came from mere statistics. Further, defense counsel erroneously stated that Ms. Westley was the third of three African-American prospective jurors dismissed by the State, when in fact she was only the third dismissed out of four African-American prospective jurors. The trial court clearly concluded, perhaps in the light of the State’s acceptance of Ms. Hawkins, that there was no pattern of racial discrimination by the State in its exercise of peremptory challenges. Considering the record as a whole, we cannot conclude that the trial judge abused his discretion in denying defendant’s second Batson objection.
This assignment of error is without merit.
ASSIGNMENT OF ERROR # 3
In his third assignment of error, defendant argues that the trial judge erred by allowing the State to amend defendant’s indictment, immediately prior to the beginning of trial, to allow neglect to be proven as an element of cruelty to juveniles in both count one, his second degree murder charge, and count two, his cruelty to juveniles charge related to K.N. Defendant asserts that this amendment hampered his ability to present a defense on those charges.
Defendant’s indictment was amended and reissued multiple times throughout the pretrial proceedings in this case. On No *47 vember 19, 2009, he was initially charged with the first degree murder of K.N. via a grand jury indictment. On August 10, 2010, a grand jury amended defendant’s indictment to charge him again with first degree murder and to list four alleged aggravating circumstances. On January 19, 2011, the 1 i2State amended the August 10, 2010 indictment to remove the listing of the aggravating circumstances.
On February 23, 2012, a grand jury issued an amended indictment to charge defendant with second degree murder, second degree cruelty to juveniles, and cruelty to juveniles. The language of count one of this amended indictment alleged that defendant unlawfully murdered K.N. while he “was involved in the commission of the crime of second degree cruelty to a juvenile against said juvenile....” In count two, the indictment alleged that defendant, between April 20, 2009 and October 20, 2009, “did then and there unlawfully and intentionally or with criminal negligence did mistreat [K.N.], causing serious bodily injury or neurological impairment to said child ... in violation of La. R.S. 14:93.2.3.” Finally, in count three, the indictment alleged that between April 20, 2009 and October 20, 2009, defendant “did then and there unlawfully and intentionally commit cruelty to a juvenile, [K.H.], in violation of La. R.S. 14:93.” On July 13, 2012, the State amended the February 23, 2012 indictment to allege that defendant committed the second degree murder of K.N. either by having the specific intent to kill or inflict great bodily harm on K.N., or “while engaged in the perpetration or attempted perpetration of a second degree cruelty to a juvenile or a cruelty to a juvenile....” The formatting of counts two and three differed slightly in the July 13, 2012 amended indictment, but their essential language remained the same.
On September 7, 2012, the State issued yet another amended indictment. Count one of this amended indictment charged defendant with the second degree murder of K.N. by having the specific intent to kill or inflict great bodily harm upon K.N., “or while engaged in the perpetration of a second degree cruelty to a juvenile or a cruelty to a juvenile of [K.N.]; or while engaged in the attempted perpetration of an intentional second degree cruelty to a juvenile or an intentional cruelty to a juvenile of [K.N.].” Count two retained its essential language in yet another revised format, but the alleged date range changed to a period between April 20, 2009 and October 19, 2009. Count three was amended to charge simply that defendant “DID THEN AND THERE ... | ^unlawfully commit cruelty to a juvenile of [K.H.] ... in violation of La. R.S. 14:93,” omitting the word “intentionally” from the previous indictments. Finally, on September 17, 2012, the State amended count two to charge simply that defendant “DID THEN AND THERE ... commit cruelty to a juvenile [K.N.].... ”
On September 19, 2012, after the jury had been selected but before it had been formally seated, defense counsel objected to the latest amendment to the indictment. Defendant argued that the prior versions of his indictment had failed to adequately inform him that the State may attempt to prove neglect as an element of cruelty to juveniles or second degree cruelty to juveniles.
As relevant to the instant case, “cruelty to juveniles” is the intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child. See La. R.S. 14:93(A)(1). “Second degree cruelty to juveniles” is the intentional or criminally *48 negligent mistreatment or neglect by anyone over the age of seventeen to any child under the age of seventeen which causes serious bodily injury or neurological impairment to that child. See La. R.S. 14:93.2.3(A)(1). “Mistreatment” as used in these statutes is equated with abuse. See State v. Booker, 2002-1269, p. 5 (La.App. 1 Cir. 2/14/03), 839 So.2d 455, 459, writ denied, 2003-1145 (La.10/31/03), 857 So.2d 476. Criminally negligent mistreatment or neglect of the juvenile exists when, although neither specific nor general intent is present, there is such disregard of the interest of the juvenile that the defendant’s conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances. Id. If a perpetrator kills a human being while engaged in either cruelty to juveniles or second degree cruelty to juveniles, he may be found guilty of second degree murder even though he has no intent to kill or to inflict great bodily harm. See La. R.S. 14:30.1(A)(2).
Defendant argued to the trial court, and now argues on appeal, that the language of his numerous indictments failed to adequately inform him before trial that the State would attempt to prove his guilt of either second degree murder or cruelty to | ^juveniles as related to K.N. via possible proof of neglect. He contends that the language initially charging him with second degree cruelty to a juvenile by “unlawfully and intentionally or with criminal negligence mistreating]” K.N., did not include notice that the State might prove his guilt on counts one or two by proving that defendant neglected K.N.
In a criminal prosecution, an accused shall be informed of the nature and cause of the prosecution against him. La. Const, art. I, § 13. However, the requirement that a defendant be informed of the nature and cause of the prosecution is not restricted to mean that he must be so informed by indictment. The State may also inform defendant of the precise allegations to be proven at trial by means of a bill of particulars. See La.Code Crim. P. art. 484; see State v. Gainey, 376 So.2d 1240, 1242-1243 (La.1979).
Herein, after the filing of the February 23, 2012 indictment charging him with second degree murder, second degree cruelty to juveniles, and cruelty to juveniles, defendant filed a second amended motion for a bill of particulars. The State filed a response to this motion for a bill of particulars on June 13, 2012. In its response, the State alleged that defendant committed second degree murder by violating subsections (A)(1) and/or (A)(2) of La. R.S. 14:30.1. The State further alleged that defendant committed second degree cruelty to juveniles of K.N. by inflicting “[s]erious bodily injury or neurological impairment by means of an intentional act and/or criminally negligent mistreatment and/or neglect” (Emphasis ours.) Finally, the State detailed that it intended to prove defendant committed cruelty to juveniles of K.H. “[i]n violation of La. R.S. 14:93(A)(1),” the language of which includes “intentional or criminally negligent mistreatment or neglect.” (Emphasis ours.)
The trial judge listened to arguments from both sides, including the State’s argument regarding its bill of particulars, and he ultimately allowed the State to amend the indictment and to offer proof of “neglect” at trial. He noted that “neglect” is part of the statutes alleged to be violated, and he apparently found persuasive the State’s argument that defendant had been put on notice by the State’s filing of an answer to his motion for a bill of particulars.
*49 |1sIn reviewing the record as a whole, we conclude that the trial court did not err or abuse its discretion in allowing the State to amend the indictment before the beginning of defendant’s trial. A trial court may at any time cause the indictment to be amended to correct a formal defect, imperfection, omission, or uncertainty. Before the trial begins, the court may order an indictment amended with respect to a defect of substance. See La. Code Crim. P. art. 487(A). A jury trial commences when the first prospective juror is called for examination. See La.Code Crim. P. art. 761, While the State’s amendment of the charge on count two from second degree cruelty to juveniles to cruelty to juveniles would qualify as a substantive change, the State clearly informed defendant and the trial court of this amendment on September 17, 2012, prior to the questioning of any prospective jurors. Further, we doubt that defendant suffered any prejudice by this amendment because of the inclusion of the elements of the latter offense within the elements of the former. On September 19, 2012, prior to opening statements, defendant argued that the State’s amendment of count two prejudiced him because the State might attempt at trial to prove his guilt on that charge by presenting evidence of neglect. The trial court rejected that argument, but the record indicates that the trial judge may have directed the State to make some minor, clerical changes to the September 17, 2012 amended indictment. However, any such changes were certainly of form, not of substance, and the trial court had the authority to direct these changes at any time. See La.Code Crim. P. art. 487(A).
We disagree with defendant’s contention that the State did not sufficiently inform him of the fact that the State might attempt to prove neglect at trial, either as an element of one of the underlying offenses for his second degree murder charge, or as an element of cruelty to juveniles on count two. The State’s answer to the bill of particulars was filed after the February 23, 2012 amended indictment charging defendant with second degree cruelty to juveniles. The State specifically informed defendant in that answer that it might prove neglect at trial. Defendant’s charge on count two did not change in substance until it was downgraded to a lesser, included offense, on September 17, 2012. Therefore, we find that defendant was adequately |1ñinformed that evidence of neglect might be introduced as proof of that offense. Similarly, defendant was well aware that the State intended to prove that he committed the second degree murder of K.N. either by showing that he had specific intent to kill or to inflict great bodily harm, or by showing that the killing occurred while defendant was engaged in the perpetration or attempted perpetration of cruelty to juveniles or second degree cruelty to juveniles. Because the State adequately informed defendant of its potential to prove the neglect elements of the cruelty to juveniles offenses, he was also adequately informed of this fact for his prosecution for second degree murder.
This assignment of error is without merit.
ASSIGNMENT OF ERROR # 4
In defendant’s fourth assignment of error, he alleges that the trial court erred in denying his motion for special jury charges on the definitions of second degree murder, second degree cruelty to juveniles, and cruelty to juveniles.
Prior to trial, defendant submitted a request for special jury charges on the offenses of second degree cruelty to juveniles and cruelty to juveniles. Defendant *50 hoped to have these special jury instructions read as part of the definition of second degree murder, as well, because of the State’s claim that defendant might have killed K.N. while engaging in the perpetration or attempted perpetration of one of those offenses. These proposed jury instructions, in pertinent part, described the offenses as “intentional or criminally negligent mistreatment,” leaving out the element of neglect The trial judge denied defendant’s request for these special instructions and instead defined the offenses for the jury, in pertinent part, as “intentional or criminally negligent mistreatment or neglect.”
The State and the defendant shall have the right before argument to submit to the court special written charges for the jury. Such charges may be received by the court in its discretion after argument has begun. A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. See La. Code Crim. P. art. 807.
|17In the instant case, the trial judge did not err or abuse his discretion in denying defendant’s request for a special jury charge on the definitions of second degree murder, second degree cruelty to juveniles, and cruelty to juveniles. The requested charges were not wholly correct because they did not correspond to the statutory language of La. R.S. 14:93 or La. R.S. 14:93.2.3 due to their failure to include the element of neglect. As explained in our discussion of his third assignment of error, defendant was properly informed of the fact that the State might prove neglect as an element of these offenses. Therefore, it would have been improper for the trial judge to eliminate the element of neglect from the jury charges.
This assignment of error is without merit.
ASSIGNMENT OF ERROR # 5
In his fifth assignment of error, defendant alleges that the trial judge erred in limiting his cross-examination of Kimberly Nelton regarding her understanding of the potential sentences she might face if the State elected to charge her with second degree murder or manslaughter. He contends that this limitation infringed upon his Sixth Amendment right to confront the witnesses against him.
In all criminal prosecutions, the accused shall have the right to be confronted with the witnesses against him. See U.S. Const, amend. VI; see also La. Const, art. I, § 16. Confrontation means more than being allowed to confront the witness physically. The main and essential purpose of confrontation is to secure the opportunity of cross-examination. See Davis v. Alaska, 415 U.S. 308, 315-316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). A witness may be cross-examined on any matter relevant to any issue in the case, including credibility. La.Code Evid. art. 611(B). the exposure of a witness’s motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. Davis, 415 U.S. at 316-317, 94 S.Ct. at 1110.
In the instant case, the State disclosed to defense counsel that it had been in contact with Nelton regarding her testimony. The State indicated in open court that it had told Nelton if she testified truthfully and honestly, the State would take that 11stestimony into consideration relating to her own charges of cruelty to juveniles, regardless of whether defendant was found guilty or not guilty. Defense counsel inquired about whether Nelton had been offered any specific deals, but the State replied that she had not.
*51 During direct examination, the State asked Nelton whether they had any agreement about what kind of sentence she would get for her offenses. She responded negatively. Nelton did admit that the State had told her that she would be given consideration if she testified truthfully and honestly at trial, regardless of the ultimate decision on defendant’s guilt. However, she was explicit in answering that no promises or deals had been made with her.
On cross-examination, defense counsel asked Nelton whether she was aware that the State could still charge her with second degree murder or manslaughter for KN.’s death. The State immediately objected on the grounds that she was not, and had never been, charged with either of those offenses. The trial judge sustained the State’s objection, and defendant noted his objection to this ruling. Defense counsel continued to ask Nelton questions about whether she had any deal with the State. Each time, she replied that she had been offered no deal or promise and that she had been told only that the State would take her testimony into consideration.
After Nelton’s testimony, defendant renewed his objection to the trial court’s limitation of Nelton’s cross-examination about her awareness that the State could still seek homicide charges against her. Defendant argued that Giglio v. U.S., 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), supported his contention that he should have been allowed to cross-examine Nelton about her exposure to additional, future charges. After brief argument and a recess for the trial judge to read Giglio, he overruled defendant’s objection, finding that no deals had been made with Nelton and that the instant case was not based wholly on her testimony.
In Giglio, 405 U.S. at 151-153, 92 S.Ct. at 764-765, the defendant’s indictment and conviction arose entirely from the testimony of one witness, who was the defendant’s coconspirator. After the defendant had been found guilty, new evidence 11flcame to light that the witness had been told by one assistant district attorney that he would not be prosecuted for his own offenses if he testified before the grand jury and at trial. The assistant district attorney who actually prosecuted the defendant was unaware of this promise because it was made to the witness by another assistant. The prosecuting attorney had void the witness that he would simply have to rely on the good judgment of the government about whether he would be prosecuted if he testified.
The Supreme Court reversed the defendant’s conviction. Because the government’s case depended “almost entirely” on the witness’s testimony, the Court found that without it there could have been no indictment and no evidence to carry the case to the jury. As a result, the Court stated that the witness’s credibility was an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility, entitling the jury to know of it. Giglio, 405 U.S. at 154-155, 92 S.Ct. at 766.
After reading Giglio, the trial judge in the instant case denied defendant’s objection to the limitation of cross-examination for. two reasons. First, the trial judge found that Nelton’s testimony was not the sole basis for the State’s case against defendant. Second, he found that the State had made no deals with Nelton regarding her future prosecution.
Considering the record as a whole, we find that the trial court did not err or abuse its discretion in limiting defendant’s cross-examination of Nelton regarding potential second degree murder or manslaughter charges. While the State clearly *52 offered Nelton “consideration” if she testified truthfully and honestly at defendant’s trial, the record reflects that this consideration was a nebulous concept that did not extend to a specific agreement to dismiss any charges against her or to recommend reduced sentences. Moreover, the idea of future “consideration” was presented to the jury on both direct and cross-examination. In addition, while defense counsel was correct in her assertion that the State could still elect to charge Nelton with a homicide offense for the death of K.N., nothing in the record indicates that the State ever considered pursuing such a charge or that Nelton had been threatened with a homicide charge if |gnshe elected not to testify. Under those facts, we cannot assume that there was “evidence of any understanding or agreement as to a future prosecution” for either second degree murder or manslaughter, Finally, while Nel-ton’s testimony was perhaps the most helpful of all the witnesses presented by the State, it was by no means the only evidence offering proof of defendant’s guilt, as was the witness’s testimony in Giglio. This assignment of error is without merit.
ASSIGNMENT OF ERROR # 6
In his final assignment of error, defendant argues that the trial court erred in allowing the State to introduce Kimberly Nelton’s out-of-court statement through the testimony of Detective Kody Voisin because he was not allowed to cross-examine Nelton on the contents of that statement.
Nelton testified at trial regarding defendant’s past abuse of her children and their actions on the night of K.N.’s death. Her trial testimony conflicted with her statements made in her first interview with the police on the day K.N. died. As a result, on cross-examination, defense counsel repeatedly used the contents of that first statement in an attempt to impeach Nel-ton’s trial testimony. After Nelton finished testifying and was released from her subpoena, defendant sought, and was granted, permission to publish to the jury a 91-page transcript of Nelton’s first statement as evidence of her impeachment.
In response, the State sought permission to introduce Nelton’s second statement to the jury through the testimony of Detective Kody Voisin of the Terrebonne Parish Sheriffs Office. The State argued that it should be allowed to do so because the second statement was consistent with Nelton’s trial testimony and because it would be offered to rebut defendant’s implicit argument that Nelton’s trial testimony was a recent fabrication. Defense counsel objected, arguing that she would be unable to cross-examine Nelton about information she might have gathered between her first and second statements. The trial judge ordered the second statement to be partially redacted to delete Detective Voisin’s assertion to Nelton that defendant had confessed to the crime and then allowed the State to publish the statement to the jury.
1 g1A statement is not hearsay if the declarant testifies at trial and is subject to cross-examination concerning the statement, and the statement is consistent with his testimony and is offered to rebut an express or implied charge of recent fabrication or improper influence or motive. See La.Code Evid. art. 801(D)(1)(b). The Confrontation Clause of the Sixth Amendment is not violated by admitting a defendant’s out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination. See California v. Green, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970).
*53 In the instant case, Nelton testified at trial and was subject to full cross-examination. Further, her out-of-court, consistent statement was offered by the State to rebut an implied charge that she had recently fabricated her trial testimony in an effort to get favorable consideration from the State.
Defendant argues that Nelton was not actually subject to full cross-examination on her second statement because she was not questioned about it when she was called as a witness. However, as the trial judge pointed out during arguments concerning the admission of this statement, defense counsel had every opportunity to cross-examine Nelton regarding the second statement, but apparently elected not to do so because it was not helpful to defendant’s case. The record also reveals that defendant was fully aware of the existence of Nelton’s second statement, as defense counsel actually asked Detective Jamie Trahan, an evidence custodian for the Terrebonne Parish Sheriffs Office, to identify it during his cross-examination.
We do not read the words “subject to cross-examination” in Article 801(D)(1) to mean “actually cross-examined.” Defense counsel clearly had an opportunity to cross-examine Nelton regarding either or both of her statements to the police, and she made a strategic judgment to cross-examine Nelton on the impeaching statement only. Now, defendant would have us allow him to introduce Nelton’s entire 91-page first statement to the jury for impeachment purposes after her release from her subpoena, but then to disallow the State from introducing her second, consistent statement because defense counsel elected not to cross-examine Nelton on it. We find that such a result would be 122patently unfair. Other circuits have seen fit to allow a witness’s prior consistent statement to be introduced through the testimony of a subsequent witness, without the first witness being explicitly cross-examined on those statements. See, e.g., State v. Davis, 626 So.2d 800, 806-807 (La.App.2d Cir.10/27/93), writ denied, 93-2945 (La.2/25/94), 632 So.2d 762; State v. Miller, 2006-0451, pp. 11-14 (La.App. 5 Cir. 10/31/06), 945 So.2d 773, 780-782. We find no reason to hold otherwise. Therefore, the trial judge did not err or abuse his discretion in allowing the State to publish to the jury Nelton’s second statement.
This assignment of error is without merit.
CONVICTIONS AND SENTENCES AFFIRMED.

. In accordance with La. R.S. 46;1844(W), the victims herein are referenced only by their initials.

. The rule is now different at the federal level. See United States v. Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000) (exhaustion of peremptory challenges does not trigger automatic presumption of prejudice arising from trial court’s erroneous denial of a cause challenge).

. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).