NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2022 KA 0553

STATE OF LOUISIANA

VERSUS

RUDY EMANUEL MELERINE

*Judgment Rendered:* DEC 2 2 2022

\* \* \* \* \* \* \* \*

Appealed from the
22nd Judicial District Court
In and for the Parish of St. Tammany
State of Louisiana
Case No. 591609

The Honorable John A. Keller / Raymond S. Childress, Judges Presiding

\* \* \* \* \* \* \* \*

Bertha M. Hillman
Covington, Louisiana

Rudy Emanuel Melerine
Jackson, Louisiana

Warren L. Montgomery
District Attorney
J. Bryant Clark, Jr.
Assistant District Attorney
Covington, Louisiana

Counsel for Defendant/Appellant
Rudy Emanuel Melerine

Defendant/Appellant
Pro Se

Counsel for Appellee
State of Louisiana

\* \* \* \* \* \* \* \*

BEFORE: THERIOT, CHUTZ, AND HESTER, JJ.

**THERIOT, J.**

The defendant, Rudy Emanuel Melerine, was charged by bill of information with two counts of attempted first degree murder, violations of La. R.S. 14:30 and La. R.S. 14:27, and pled not guilty on each count.[1] He filed two pretrial motions to suppress statements.[2] The trial court heard and denied the motions. After a trial by jury, the defendant was found guilty as charged on each count. Prior to sentencing, the State filed a habitual offender bill of information.[3] The defendant later filed motions for new trial and for post-verdict judgment of acquittal.

In a subsequent proceeding,[4] the trial court first denied the defendant's post-trial motions.[5] The trial court then sentenced the defendant to ten years imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence on count one, and to thirty years imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence on count two, to be served concurrently. The trial court next conducted a hearing on the habitual offender bill of information and adjudicated the defendant a second felony habitual offender on both counts. The trial court vacated the original sentences, and resentenced the defendant under the Habitual Offender Law to twenty-five years imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence on count one, but maintained the original sentence of thirty years imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence on count two. The trial court further ordered the sentences to run

---

[1] The defendant originally pled not guilty and not guilty by reason of insanity. The trial court appointed a sanity commission. After reviewing the doctors' reports, the trial court found the defendant competent to stand trial. The defendant withdrew his original pleas and pled not guilty to each count.

[2] The motions were filed two years apart and raise the same arguments.

[3] The habitual offender bill of information sets forth a predicate conviction in the 34th Judicial District Court for operating a vehicle while intoxicated, third offense, on August 22, 2012.

[4] The trial court handled the post-trial motions, original sentencing, habitual offender adjudication, and habitual offender sentencing all on the same date.

[5] The trial court vacated prior rulings denying the motions, allowed the parties an opportunity to argue on the motions, and again denied both motions.

concurrently. The trial court denied the defendant's oral motion to reconsider sentence.

The defendant now appeals, assigning error in a counseled brief to the sufficiency of the evidence to support the convictions. In a pro se brief, the defendant assigns error to the trial court's rulings on his motions to suppress statements and alleges prosecutorial misconduct. For the following reasons, we affirm the convictions, habitual offender adjudication, and sentences.

## STATEMENT OF FACTS

On June 20, 2017, during the early morning hours, Corporal Jesse Smith with the St. Tammany Parish Sheriff's Office (STPSO) was dispatched to a disturbance off of North Willie Road in Folsom involving an elderly couple, Kirk and Wendy Melerine (the victims), and their son (the defendant). When Corporal Smith arrived at the scene, he observed Mrs. Melerine crouching in the driveway. She was disoriented and confused, and she appeared to have blood on her face. Mrs. Melerine told Corporal Smith that her son was in the back of the home attacking her husband.

According to the victims' testimony at trial, they were asleep in bed when the defendant "busted" into their bedroom at about 5:00 a.m. and began beating Mr. Melerine with a hammer. As Mrs. Melerine turned to look up, the defendant held her by her shoulder with one hand, as he was swinging the hammer at Mr. Melerine with his other hand. Mrs. Melerine pushed the defendant and yelled out to him, and the defendant then hit her with the hammer "a few times." Mr. Melerine pushed the defendant off Mrs. Melerine, and all three of them fell to the floor as the defendant continued to swing the hammer and kick Mr. Melerine. While on his back on the floor, Mr. Melerine struggled with the defendant over the hammer. Mrs. Melerine was "kind of woozy" but attempted to grab the hammer and push the defendant off of her husband. She testified she was unsuccessful, as

3

the defendant "had the strength of ten men." Mr. Melerine started screaming at her to call 911. At that point, the defendant punched her, and she fell to the floor. She managed to get up and get to the phone to dial 911.

Upon entering the home, Corporal Smith observed blood spatter on the wall in the hallway and on the floor. As he approached the hallway, he had a view of the back bedroom and saw blood all over it. He observed Mr. Melerine, who was only wearing underwear and was covered in blood. The defendant was hovering over Mr. Melerine. As Corporal Smith got a closer view, he observed that the defendant and Mr. Melerine were struggling over a hammer. Corporal Smith, who already had his weapon drawn, ordered the defendant to get off of Mr. Melerine and to get on the ground with his hands behind his back. Mr. Melerine was unresponsive at the time. After back up officers arrived, the defendant was handcuffed and placed in a patrol car as EMS and the fire department arrived to treat the victims. Corporal Smith transported the defendant to the Covington Law Enforcement Complex (police complex). During the attack, the defendant hit both victims in the head with the hammer, and Mr. Melerine, who sustained the most blows, had to get nine staples.

## COUNSELED ASSIGNMENT OF ERROR

In the sole counseled assignment of error, the defendant argues he could not have formed specific intent to support the convictions because he was intoxicated when he attacked his parents. He contends the defense proved by a preponderance of the evidence that he was intoxicated at the time of the offenses, and the State did not negate the defense beyond a reasonable doubt. He contends the empty Kratom[6] bag located in his room and testimony regarding his erratic behavior indicates he

---

[6] According to police testimony presented at trial, Kratom is an over-the-counter, legal substance that can cause psychological effects such as hallucinations, and while it can have a "sedating effect" on some people, it can have a "high energy effect" on others. In its opening statement, the State described Kratom as "almost like a synthetic marijuana."

4

was taking Kratom on June 19 and June 20, 2017. The defendant acknowledges he was violent toward his father on one other occasion while using drugs (Salts). He notes he was committed to a mental institution in connection with that incident. The defendant concedes that drug use may not have been obvious from his demeanor at the time of the instant offenses, but notes that a different drug was involved. The defendant further concedes that the State showed that he did not appear to be intoxicated after the incident, but contends that the effects of Kratom dissipate after fifteen or twenty minutes.

The State contends no evidence was presented in this case to show the defendant was either intoxicated or even consumed narcotics on the day that the crimes were committed. The State maintains that the empty Kratom bag located in the defendant's bedroom "is determinative of nothing." The State points out that it is unknown how long the bag had been there or when the substance was taken. The State notes that the defendant's demeanor, according to witnesses, showed he was not intoxicated. Further, the State notes that there was no evidence presented to show that the effects of Kratom dissipate after fifteen or twenty minutes. Finally, the State concludes that even if it were assumed that the defendant ingested narcotics on the day of or the day before the offenses, any possible intoxication was not severe enough to preclude specific intent.

A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of review for sufficiency of the evidence to support a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the State proved the essential elements of the crime and the defendant's identity as the perpetrator of the crime beyond a reasonable doubt. See La. Code Crim. P. art. 821(B); **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); **State v. Ordodi**, 2006-0207 (La. 11/29/06),

5

946 So.2d 654, 660; **State v. Williams**, 2019-0077 (La. App. 1st Cir. 5/31/19), 2019 WL 2315340, at *2, writ denied, 2019-01060 (La. 10/1/19), 280 So.3d 158. The **Jackson** standard of review, incorporated in Article 821(B), is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the fact finder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. **State v. Patorno**, 2001-2585 (La. App. 1st Cir. 6/21/02), 822 So.2d 141, 144. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. **State v. Dyson**, 2016-1571 (La. App. 1st Cir. 6/2/17), 222 So.3d 220, 228, writ denied, 2017-1399 (La. 6/15/18), 257 So.3d 685.

Under La. R.S. 14:30(A)(3), first degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm upon more than one person. An attempted offense is committed when a defendant, "having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object." La. R.S. 14:27(A). Thus, to be convicted of attempted first degree murder under La. R.S. 14:30(A)(3), the State must prove a defendant possessed the specific intent to kill more than one person and committed an overt act toward that goal.

Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Specific intent is an ultimate legal conclusion to be resolved by the

6

fact finder. **State v. Currie**, 2020-0467 (La. App. 1st Cir. 2/22/21), 321 So.3d 978, 983.

Voluntary intoxication is a defense to a prosecution for a specific intent crime only if the circumstances indicate that it has precluded the presence of specific criminal intent. See La. R.S. 14:15(2); **State v. Ross**, 2011-0791 (La. App. 1st Cir. 11/9/11), 2011 WL 5429584, at *4, writ denied, 2011-2731 (La. 4/13/12), 85 So.3d 1244. The defendant has the burden of proving his intoxication defense. Thereafter, the State must negate that defense by proving beyond a reasonable doubt that specific intent was present despite the defendant's alleged intoxication. The question of whether the defendant's intoxication precluded him from forming specific intent is a question to be resolved by the jury. **State v. Mickelson**, 2012-2539 (La. 9/3/14), 149 So.3d 178, 183; **State v. Hayes**, 2016-0441 (La. App. 1st Cir. 9/19/16), 204 So.3d 201, 205, writ denied sub nom., **State v. Hazes**, 2016-1886 (La. 9/6/17), 224 So.3d 979.

At the trial herein, Corporal Smith, the initial officer to arrive on the scene, testified that the defendant did not exhibit any signs of intoxication or of being under the influence of anything while he interacted with him. Corporal Smith testified that the defendant followed commands with very minimal if any resistance at all. When he ordered the defendant to get on the ground, the defendant told him that he was just trying to help and claimed that the culprit ran out of the back door. Corporal Smith subsequently transported the defendant to the police complex in Covington.

Sergeant Justin Parker with the STPSO was notified of the instant incident and reported to the police complex in Covington. After speaking to Corporal Smith, Sergeant Parker made contact with the defendant. Sergeant Parker testified that while he was advising the defendant of the next steps to be taken regarding his custody, the defendant asked if his parents were still alive. Once told that his

7

parents were alive, the defendant wanted to know what they were saying had happened at the house. At that point, Sergeant Parker ended the conversation with the defendant. Due to the large amount of blood on the defendant, a search warrant for his person was obtained. Sergeant Parker testified that the defendant did not act intoxicated or erratic. He noted the defendant had a very calm demeanor and seemed to fully comprehend instructions. While executing a search warrant for the residence, Sergeant Parker recovered an empty Kratom bag inside one of the open drawers of the nightstand in the defendant's room. No loose Kratom was found.

Deputy Megan Sellstrom, a crime scene technician, processed the defendant for evidence, including photographs, fingerprints, clothing, and DNA, pursuant to the search warrant. Deputy Sellstrom described the defendant's demeanor as "a bit agitated" but also "cooperative." She denied that the defendant was stumbling or had slurred speech. She testified that the defendant told her that he was covered in blood because he was fighting off someone who was in his parents' house.

Mrs. Melerine testified that the defendant lived with her and Mr. Melerine almost all of his life, only living somewhere else for a short period of time. The defendant had different jobs "here and there" and was shrimping at the time of the offenses. When asked if the defendant ever had a drug or alcohol problem, she replied, "Drugs." However, Mrs. Melerine testified she had never seen the defendant use drugs, and she did not know the drugs with which he struggled. She stated that the defendant started using drugs when he was about eleven-years old. Mrs. Melerine confirmed that she had an opportunity to see the defendant's behavior when he was not intoxicated or on drugs. In describing his demeanor in the days leading up to the incident, she testified that he had quit shrimping, began staying in his room, did not want to associate with anyone, and "just got strange." Mrs. Melerine stated that she did not know what was going on with the defendant. She described comments by the defendant in which he was "talking all kind of

8

crazy stuff that his dad hurt him, his grandfather hurt him, and then he got to me." Mrs. Melerine stated that the defendant said things about her that were not true.

When asked how she knew the defendant had a drug problem, Mrs. Melerine in part noted "they just get so [sic] can't talk right, you know, slurring, the whole bit." When asked if the defendant was slurring at the time of the offenses, she said, "No, not a word." She further stated he was not falling down or stumbling. Mrs. Melerine testified that although the defendant was being reclusive preceding the incident, she did not know whether he was taking drugs. She confirmed that he did not seem intoxicated when he came out to eat a meal that she had made for him and "seemed fine." Mrs. Melerine testified that the defendant did not seem intoxicated when he made comments about being mistreated. She noted the defendant never had an alcohol problem and that the drug use was an "off and on thing." When Mrs. Melerine was asked again if it appeared the defendant was on drugs the morning the attack happened, she stated, "I can't say that ... I really feel like it was more a mental issue."

Mr. Melerine described the defendant's behavior the day before the incident as "a bit erratic." He specified that the defendant was "kind of out of his head" and telling a bunch of lies, stating, "like, you know, you did this to me, you did that to me." The day after the attack, after he was released from the hospital, Mr. Melerine went into the defendant's room and noticed that he had packed clothes and other things in a backpack. Mr. Melerine testified that "[a] couple of years ago" the defendant came up with "this stuff" about Mr. Melerine molesting him and his older brother. Mr. Melerine further stated that the defendant's older brother assured the defendant that nothing like that ever happened. He added, "But that's what he got in his head, so ain't much you could do about that."

9

Mr. Melerine confirmed that he had seen the defendant while under the influence before although he did not know what kind of drugs the defendant used. When asked if the defendant appeared to be under the influence at the time of the instant offenses, Mr. Melerine stated, "Not to me, no." He further denied the defendant seemed to be under the influence the night before the incident. Mr. Melerine stated that the defendant's actions were "intentional."

Mr. Melerine testified that the defendant tried to kill him years before with a "big crescent wrench." At that time, he assumed the defendant was on bath salts, stating, "He was out of it that time. It was like he'd stand up, and he would just, like, fall flat on his face." Mr. Melerine confirmed that the defendant claimed to be the Archangel Michael during the instant attack, which Mr. Melerine considered outlandish as opposed to erratic.

In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. **State v. Dorsey**, 2010-0216 (La. 9/7/11), 74 So.3d 603, 634, cert. denied, 566 U.S. 930, 132 S.Ct. 1859, 182 L.Ed.2d 658 (2012). Further, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. Accordingly, on appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. **State v. Lavy**, 2013-1025 (La. App. 1st Cir. 3/11/14), 142 So.3d 1000, 1006, writ denied, 2014-0644 (La. 10/31/14), 152 So.3d 150.

The verdicts rendered in this case indicate that the jury rejected the defendant's theory that he was too intoxicated to have formed specific intent in this case. The defendant's parents knew him well, as he had lived with them nearly his whole life. They observed him while on drugs and while not on drugs, and did not

10

believe that he was on drugs at the time of the instant offenses. The law enforcement officers who interacted with the defendant just after the offenses consistently testified that he did not appear to be intoxicated or under the influence of any substance. There was no testimony regarding the effect of Kratom on the defendant and no evidence to show that the defendant had ingested or was under the influence of the substance at the time of the offenses. In reviewing the evidence presented at trial, we cannot say that the jury's determination was irrational under the facts and circumstances presented. See **Ordodi**, 946 So.2d at 662. Based on our review of the evidence presented in the light most favorable to the State, we find the jurors could have reasonably decided that the defendant was not intoxicated, or that he was not so intoxicated as to preclude the presence of specific intent.

An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. See **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). Further, a court of appeal impinges on a fact finder's discretion beyond the extent necessary to guarantee the fundamental protection of due process of law in accepting a hypothesis of innocence that was not unreasonably rejected by the fact finder. See **State v. Mire**, 2014-2295 (La. 1/27/16), 269 So.3d 698, 703 (per curiam). After a thorough review of the record, we are convinced that a rational trier of fact, viewing the evidence in the light most favorable to the State, could find that the State proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of each count of attempted first degree murder. The sole counseled assignment of error lacks merit.

## PRO SE ASSIGNMENT OF ERROR NUMBER ONE

In pro se assignment of error number one, the defendant argues the police violated established law by continuing to talk to him in an attempt to elicit a statement after he invoked his right to remain silent and had asked for a lawyer. He contends that he did not initiate further communication with the police after asking for his attorney. The defendant argues his constitutional rights were violated and notes that he objected when the trial court ruled that statements he made after invoking his **Miranda** rights were admissible.

When a court denies a motion to suppress, factual and credibility determinations should not be reversed in the absence of a clear abuse of the court's discretion, i.e., unless such ruling is not supported by the evidence. See **State v. Green**, 94-0887 (La. 5/22/95), 655 So.2d 272, 280-81. However, a court's legal findings are subject to a de novo standard of review. See **State v. Hunt**, 2009-1589 (La. 12/1/09), 25 So.3d 746, 751. In determining whether the ruling on defendant's motion to suppress was correct, we are not limited to the evidence adduced at the hearing on the motion. We may consider all pertinent evidence given at the trial of the case. **State v. Chopin**, 372 So.2d 1222, 1223 n.2 (La. 1979).

In **Miranda v. Arizona**, 384 U.S. 436, 444-45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), the Supreme Court found that if a suspect indicates "in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." **Edwards v. Arizona**, 451 U.S. 477, 481-85, 101 S.Ct. 1880, 1883-85, 68 L.Ed.2d 378 (1981) reconfirmed these views and, to lend them substance, held that when an accused either before or during interrogation asks for counsel, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated, custodial interrogation, even if he has been advised of his rights. The accused is not subject to further

interrogation by the authorities until counsel is present, unless the accused himself initiates further communication, exchanges, or conversations with the police. **Edwards**, 451 U.S. at 484-85, 101 S.Ct. at 1885; see **Maryland v. Shatzer**, 559 U.S. 98, 103-05, 130 S.Ct. 1213, 1219, 175 L.Ed.2d 1045 (2010); **State v. Winfrey**, 2012-0940 (La. App. 1st Cir. 2/15/13), 2013 WL 595671, at *5, writ denied, 2013-0585 (La. 10/4/13), 122 So.3d 1014.

When a defendant invokes his **Miranda** right to counsel, the admissibility of his subsequent confessions under federal law is to be determined by a two-step analysis: it first must be asked whether the defendant "initiated" further conversation; and if the answer is yes, it must be inquired whether the defendant waived his right to counsel and to silence, that is, whether the purported waiver was knowing and intelligent under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities. **State v. Abadie**, 612 So.2d 1, 5 (La. 1993), cert. denied, 510 U.S. 816, 114 S.Ct. 66, 126 L.Ed.2d 35 (1993); **Winfrey**, 2013 WL 595671 at *5 (citing **Abadie**, 612 So.2d at 5.

The Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent. The defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled. **Michigan v. Harvey**, 494 U.S. 344, 352, 110 S.Ct. 1176, 1181-82, 108 L.Ed.2d 293 (1990). See **Montejo v. Louisiana**, 556 U.S. 778, 786, 129 S.Ct. 2079, 2085, 173 L.Ed.2d 955 (2009). When a defendant exercises his privilege against self-incrimination, the validity of any subsequent waiver depends upon whether the police have "scrupulously honored" his right to cut off questioning. However, police are not obliged to ignore spontaneous and unsolicited statements by someone in custody, as long as those statements do not result from police-initiated custodial interrogation or

13

questioning "reasonably likely to elicit an incriminating response." See **State v. Tilley**, 99-0569 (La. 7/6/00), 767 So.2d 6, 11, cert. denied, 532 U.S. 959, 121 S.Ct. 1488, 149 L.Ed.2d 375 (2001). Spontaneous and voluntary statements, not given as a result of police interrogation or compelling influence, are admissible in evidence without **Miranda** warnings even where a defendant is in custody. **State v. Dickerson**, 2012-0388 (La. App. 1st Cir. 11/2/12), 2012 WL 5387365, at *7, writ denied, 2012-2580 (La. 5/3/13), 113 So.3d 209.

Herein, the State introduced statements the defendant made to three officers. The admissibility of the statements made by the defendant to Sergeant Parker was raised by the defendant in a motion to suppress filed after his initial plea of not guilty and not guilty by reason of insanity and re-filed after he withdrew the original plea and pled not guilty. The trial court held hearings on the motions to suppress and ruled the statements admissible. Sergeant Parker was the sole witness at each hearing. Sergeant Parker consistently testified that when he arrived at the police complex, Corporal Smith informed him that the defendant had stated that he wanted an attorney present for questioning. Sergeant Parker was further informed that the defendant was **Mirandized** at the scene and refused to sign a waiver of rights form while at the police complex. Sergeant Parker further testified that he introduced himself to the defendant to explain his intentions to execute a search warrant for the defendant's person that the police were in the process of obtaining. While introducing himself, he acknowledged the defendant's invocation of his right to an attorney, in part, stating, "From what I understand, you stated you want an attorney." At that point, the defendant asked if his parents were still alive. The defendant then asked what his parents were saying about the offenses. Sergeant Parker did not answer the defendant's questions but instead told him that because he had invoked his right to an attorney, they were not going to discuss the case. Sergeant Parker denied initiating any dialogue.

14

In denying the motion to suppress, at each hearing, the trial court found the defendant initiated the statements at issue. The trial court noted that there was no attempt by Sergeant Parker "to not scrupulously honor [the defendant's] right to counsel." The trial court found the defendant's statements were unsolicited and were "blurted out."

Based on our review of Sergeant Parker's testimony, we agree that the statements at issue were unsolicited and spontaneous. The officers agreed that the defendant exercised his right to an attorney. The testimony presented at the hearings and at trial showed that this right was honored, and no police officer spoke to the defendant or questioned him about the case after he stated that he wanted an attorney. The defendant, of his own volition, initiated verbal communications regarding the incident. See **State v. Caston**, 40,054 (La. App. 2d Cir. 9/28/05), 912 So.2d 413, 417 (wherein the defendant confessed to a law enforcement officer who went to the correctional facility where defendant was housed to execute a court order to obtain a blood sample; the court found the defendant's statements to be free and voluntary); see also **State v. Ham**, 93-1036 (La. App. 5th Cir. 2/15/95), 652 So.2d 15, 19, writ denied, 95-1028 (La. 3/17/97), 691 So.2d 69 (wherein the court rejected the defendant's assertion that repeated recitation of **Miranda** rights by the police was the "functional equivalent of police interrogation"). Under the totality of the circumstances, the defendant voluntarily, knowingly, and intelligently waived his right to counsel (and silence). As such, the trial court did not err or abuse its discretion in denying the motions to suppress. We find pro se assignment of error number one is without merit.

## PRO SE ASSIGNMENT OF ERROR NUMBER TWO

In pro se assignment of error number two, the defendant asserts two claims of prosecutorial misconduct. First, the defendant notes the prosecutor cut off Mrs. Melerine before she was able to finish her answer to his final question and objected

15

when she asked to be allowed to finish her testimony. The defendant argues that if Mrs. Melerine would have been allowed to finish her testimony, it would have helped the jury determine the truth and prevented the "undue burden of recall." Second, the defendant claims that during closing arguments, the State added facts and statements that were never given when retelling Mrs. Melerine's testimony. Specifically, the defendant notes while it was proven that Mrs. Melerine was struck once, the State said she testified that the defendant hit her several times as she tried to get the hammer. The defendant argues this conduct was prejudicial and there was "a grave probability that the outcome would have been different" if not for the conduct at issue, warranting a new trial.

At the outset, we note that the defendant did not object to the issues raised in this assignment of error.[7] An irregularity cannot be availed of after the verdict unless it was objected to at the time of the occurrence. La. Code Crim. P. art. 841(A). The contemporaneous objection rule has two purposes: to put the trial judge on notice of the alleged irregularity so that he may cure the problem, and to prevent the defendant from gambling on a favorable verdict and then resorting to appeal on errors that might easily have been corrected by an objection. **State v. Lanclos**, 2007-0082 (La. 4/8/08), 980 So.2d 643, 648. Accordingly, the defendant did not properly preserve for appellate review the arguments raised herein. Moreover, we note that the defendant misrepresents the record.

The State had completed its questioning of Mrs. Melerine on redirect examination when she asked to address the court without being questioned. As such, Mrs. Melerine was not completing an answer to any question and was not interrupted as claimed by the defendant. When the State objected to her desire to make an unelicited statement, as stated, there was no objection by the defendant after the trial court ruled it would be inappropriate to just let her speak. In addition

---

[7] We further note that the defendant's motion for new trial did not allege prosecutorial misconduct.

to there being no objection to the State's closing arguments, the referenced portion of the State's argument was an accurate reflection of Mrs. Melerine's testimony. We find no merit in pro se assignment of error number two.

**CONVICTIONS, HABITUAL OFFENDER ADJUDICATION, AND SENTENCES AFFIRMED.**